# Supreme Court of Florida

_____

No. SC15-1752
_____

**WILLIAM THOMPSON**
Appellant,

vs.

**STATE OF FLORIDA**
Appellee.

[November 10, 2016]

PER CURIAM.

William Lee Thompson was convicted of first-degree murder and sentenced to death for a 1976 murder. His sentence became final in 1993. Since the United States Supreme Court held that it was unconstitutional to execute persons with intellectual disabilities in Atkins v. Virginia, 536 U.S. 304 (2002), Thompson has timely raised claims that he is intellectually disabled and cannot be executed. In denying Thompson relief, as more fully explained, the trial court and this Court relied on Cherry v. State, 959 So. 2d 702, 712-14 (Fla. 2007), which held that if a defendant could not establish an IQ score of 70 or below, then his intellectual disability claim should be denied without consideration of the other prongs of the

intellectual disability test. In <u>Hall v. Florida</u>, 134 S. Ct. 1986, 1990 (2014), the

United States Supreme Court held that Florida's strict bright-line cutoff of 70 for

IQ scores with respect to the first prong of the intellectual disability test "creates an

unacceptable risk that persons with intellectual disabilities will be executed" in

violation of <u>Atkins</u> and is, therefore, unconstitutional.[1] <u>Hall</u> specifically

disapproved of the bright-line cutoff of 70 for IQ scores stated by this Court in

<u>Cherry</u>. <u>Id.</u> at 2000.

Although Thompson has had a broad range of IQ scores over his lifetime, he

received several IQ scores below 75, and in 2009 the defense expert tested him

with a score of 71. In reviewing the history of this case, it is clear that Thompson

did not receive the type of "conjunctive and interrelated assessment" that <u>Hall</u>

requires, as more recently set forth in <u>Oats v. State</u>, 181 So. 3d 457, 460 (Fla.

2015). As this Court stated in <u>Oats</u>, <u>Hall</u> did not just require that courts consider

the statistical error margin in determining IQ, it also changed the manner in which

intellectual disability evidence must be considered: "courts must consider all three

prongs in determining an intellectual disability, as opposed to relying on just one

---

1. This is an appeal from the circuit court's order denying a successive motion for postconviction relief, which was filed pursuant to Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a sentence of death, this Court has jurisdiction of the appeal under article V, section 3(b)(1), of the Florida Constitution.

factor as dispositive . . . because these factors are interdependent, if one of the prongs is relatively less strong, a finding of intellectual disability may still be warranted based on the strength of other prongs." 181 So. 3d at 467-68. This Court's recent opinion on remand in Hall v. State, 41 Fla. L. Weekly S372, 2016 WL 4697766 (Fla. Sept. 8, 2016), reaches the same conclusion in granting relief.

Because the trial court and this Court relied, in part, on the now invalid bright-line cutoff of an IQ score of 70 in denying Thompson relief, we have determined that Thompson should receive the benefit of Hall. Not only have we determined that Hall is retroactive utilizing a Witt[2] analysis, Walls v. State, 2016 WL 6137287 (Fla. Oct. 20, 2016), but to fail to give Thompson the benefit of Hall, which disapproved of Cherry, would result in a manifest injustice, which is an exception to the law of the case doctrine. See State v. Owen, 696 So. 2d 715, 720 (Fla. 1997) ("[t]his Court has the power to reconsider and correct erroneous rulings in exceptional circumstances and where reliance on the previous decision would result in manifest injustice, notwithstanding that such rulings have become the law of the case" and that "[a]n intervening decision by a higher court is one of the exceptional situations that this Court will consider when entertaining a request to modify the law of the case"). Because Thompson's eligibility or ineligibility for

---

2. Witt v. State, 387 So. 2d 922 (Fla. 1980).

execution must be determined in accordance with the correct United States Supreme Court jurisprudence, this case is a prime example of preventing a manifest injustice if we did not apply Hall to Thompson. Accordingly, we reverse the summary order denying relief and remand to the trial court for a new evidentiary hearing on intellectual disability pursuant to the United States Supreme Court's holding in Hall and this Court's holding in Oats.[3]

## FACTS AND PROCEDURAL HISTORY BEFORE ATKINS

Thompson pled guilty to the March 30, 1976, brutal beating death of the victim, Sally Ivester. Thompson v. State, 389 So. 2d 197, 198 (Fla. 1980). In Thompson, this Court described the crimes, which occurred when William Lee Thompson was 24 years old:

> The appellant Thompson, Rocco Surace, Barbara Savage, and the victim Sally Ivester were staying in a motel room. The girls were instructed to contact their homes to obtain money. The victim received only $25 after telling the others that she thought she could get $200 or $300. Both men became furious. Surace ordered the victim into the bedroom, where he took off his chain belt and began hitting her in the face. Surace then forced her to undress, after which the appellant Thompson began to strike her with the chain. Both men continued to beat and torture the victim. They rammed a chair leg into the victim's vagina, tearing the inner wall and causing internal

---

3. Thompson requested, and this Court granted, supplemental briefing addressing the United States Supreme Court's opinion in Hurst v. Florida, 136 S. Ct. 616, 619 (2016). However, we decline to address Thompson's Hurst v. Florida claim in this opinion because we remand Thompson's case for a new evidentiary hearing on intellectual disability pursuant to the United States Supreme Court's decision in Hall and this Court's opinion in Oats.

bleeding. They repeated the process with a night stick. The victim was tortured with lit cigarettes and lighters, and was forced to eat her sanitary napkin and lick spilt beer off the floor. This was followed by further severe beatings with the chain, club, and chair leg. The beatings were interrupted only when the victim was taken to a phone booth, where she was instructed to call her mother and request additional funds. After the call, the men resumed battering the victim in the motel room. The victim died as a result of internal bleeding and multiple injuries. The murder had been witnessed by Barbara Savage, who apparently feared equivalent treatment had she tried to leave the motel room.

Id.

Thompson's mental condition has been an issue in both his circuit court proceedings and his appeals before this Court. On direct appeal, this Court allowed Thompson to withdraw his plea and remanded for further proceedings. See Thompson v. State, 351 So. 2d 701 (Fla. 1977). On remand, Thompson again pleaded guilty and again received a death sentence for the first-degree murder.[4] The convictions and death sentence were affirmed by this Court. See Thompson, 389 So. 2d at 200. In affirming the convictions and death sentence, this Court concluded in pertinent part that the trial court did not abuse its discretion in declining to order further psychiatric evaluations of Thompson "in view of the four previous reports and the failure of [Thompson]'s counsel to identify any particular

---

4. On remand, codefendant Surace was subsequently found guilty of second-degree murder in a retrial in which Thompson testified and took credit for the entire incident. See Thompson, 389 So. 2d at 199.

- 5 -

circumstance that had caused the mental condition of [Thompson] to change since those prior examinations and the plea of guilty." Id. at 199. Subsequently, this Court affirmed the postconviction court's order denying relief on Thompson's first postconviction motion, in which Thompson claimed that his codefendant Surace was the dominant actor in the murder and that Surace's life sentence rendered the death sentence disproportionate. See Thompson v. State, 410 So. 2d 500 (Fla. 1982).[5] On appeal of the postconviction court's denial of his second postconviction motion, at which time Thompson also petitioned this Court for a writ of habeas corpus, this Court vacated the death sentence and remanded for resentencing because harmful error occurred when the jury was instructed that it could only consider statutory mitigation and Thompson was not permitted to present nonstatutory mitigation. See Thompson v. Dugger, 515 So. 2d 173 (Fla. 1987). Upon resentencing, the jury recommended death by a vote of seven to five, and the trial court again imposed the death penalty. Thompson v. State, 619 So. 2d 261, 264 (Fla. 1993). This Court affirmed. Id. at 267. Although Thompson's appeal from his 1989 resentencing did not present any issues related to his mental condition, this Court explained the mitigation evidence presented:

_____

5. Thompson then pursued relief in the federal courts, which was denied. See Thompson v. Wainwright, 787 F.2d 1447 (11th Cir. 1986) (affirming denial of petition for writ of habeas corpus).

- 6 -

Thompson presented numerous witnesses who testified in mitigation of his conviction, including a former church pastor, a church elder, a church member, an elementary school principal, and several family members. Thompson's former church pastor described Thompson as a slow learner and a follower who did not exhibit any violent or aggressive behavior. A church elder described Thompson as someone needing to be led, while the elder's wife described him as very faithful. Testifying from school records, an elementary school principal stated that Thompson had an IQ of seventy-five, had been recommended for special educational placement, and had been a follower, not a leader. Family members testified regarding the filthy home and affectionless environment in which Thompson had been raised. Thompson's ex-wife and mother of his two children described Thompson as a loving and gentle husband who was never physically violent or abusive. She also described Thompson as mentally slow and a follower and that their marriage failed partly because of his alcoholism.

In an affidavit introduced by Thompson, Barbara Savage characterized the codefendant, Rocco Surace, as the gang-leader, who knew how to manipulate people. She described Thompson as a gullible and easygoing person, who was easily manipulated. However, Savage's characterization of Thompson as a person dominated by Surace was contradicted by her testimony at the original trial.

A psychologist who examined Thompson stated that Thompson was a battered child and characterized him as an extremely depressed person. The psychologist stated that Thompson's IQ was at the lowest possible level of low-average intelligence. The psychologist also found Thompson to be brain-damaged and that his touch with reality was so loose and fragile that she could not tell whether Thompson was aware of what he was doing during the assault.

A psychiatrist testified that he found Thompson to be retarded and easily led and threatened by Surace. He believed Thompson to have been brain-damaged since childhood, possibly since birth. He diagnosed Thompson as having organic brain disease and suffering from personality and stress disorders. A neurologist also testified that Thompson suffered from organic brain disease.

In rebuttal, the State called the codefendant, Rocco Surace. Surace blamed Thompson for the attack on the victim, while

acknowledging that he had entered guilty pleas to the same offense. A psychiatrist presented by the State testified that he had evaluated Thompson after the incident in 1976. He found that Thompson could process information and that his memory was intact. The psychologist concluded that Thompson suffered from an inadequate personality disorder and a long-standing pattern of antisocial and impulsive behavior.

The State called another psychiatrist as an expert witness, who had seen Thompson in 1976, and, while he stated that "there was tremendous anger, rage, aggression, and diminished control with the involvement of alcohol and a number of drugs that were used," he did not feel that Thompson's conduct resulted from a mental disorder. He stated his belief that Thompson had the capacity to know what was right and what was wrong. A psychiatrist presented by the prosecution stated that he had examined Thompson in November of 1988 and had found no indication of organic brain disease or any serious deficiencies in Thompson's ability to reason, understand, or know right from wrong. He also stated that he did not believe that Thompson acted under the influence of extreme mental or emotional disturbance or that Thompson's capacity to appreciate the criminality of his conduct was substantially impaired. Furthermore, the psychiatrist stated that he did not believe Thompson acted under the substantial domination of another. Another psychologist presented by the State testified that Thompson had adequate communication skills and good general memory. He did not find Thompson to be overly susceptible to suggestion and found no evidence of major mental illness.

Id. at 263-64 (emphasis added).

Thompson then filed a third postconviction motion and appealed the summary denial of that motion to this Court, raising eighteen claims, along with a petition for habeas corpus raising thirty-six claims. Thompson v. State, 759 So. 2d 650 (Fla. 2000). In his appeal of the summary denial of his postconviction motion, Thompson alleged in pertinent part that he was incompetent to make a knowing,

intelligent, and voluntary guilty plea and that he was not competent to be executed. Id. at 655 n.4. In his habeas petition, he alleged in pertinent part that he was not competent when he pleaded guilty during his second trial, sentencing phase, and appeal, and that he was denied the assistance of mental health experts and counsel. Id. at 656 n.5. This Court affirmed the summary denial of his third postconviction motion and denied the petition for habeas corpus. Id. at 667-68. Specifically, this Court concluded that Thompson's claim that he had been denied the assistance of mental health experts when he pleaded guilty was procedurally barred because this Court previously denied the exact claim. Id. at 657 n.6. This Court also rejected Thompson's claims that his counsel was ineffective for failing to secure his right to the assistance of mental health professionals and that his appellate counsel was ineffective for failing to raise this issue on appeal. Id. at 665-66. As to Thompson's claim that he is not competent to be executed, this Court determined that the claim was not yet ripe for review. Id. at 667 n.12.

## PROCEDURAL HISTORY AFTER ATKINS

After the United States Supreme Court rendered its decision in Atkins, Thompson filed a fourth postconviction motion to vacate his death sentence under Atkins, and our newly-adopted rule 3.203, on the ground that he is intellectually disabled and exempt from execution. See § 921.137, Fla. Stat. (2001); Fla. R. Crim. P. 3.203. The postconviction court determined that Thompson's claim was

procedurally barred because the issue of intellectual disability was raised as mitigation and litigated in Thompson's 1989 resentencing proceeding.

On appeal, this Court concluded by order dated July 9, 2007, that this determination was in error because the evidence was presented for mitigation, not as evidence of intellectual disability as a bar to execution. Thompson v. State, Case No. SC05-279 (Fla. July 9, 2007). The order advised the trial court:

> [W]e reverse the trial court's summary denial and remand to the circuit court in order to allow Thompson to plead and prove the elements necessary to establish mental retardation, specifically including the threshold requirements set forth in Cherry v. State, 32 Fla. L. Weekly S151 (Fla. April 12, 2007). See also, section 921.137(1), Fla. Stat.; Fla. R. Crim. P. 3.203(c) & (e). Any motion filed in conformance with this Order shall be filed in the Circuit Court within thirty (30) days of the date of this Order. The trial court shall proceed in an expedited manner, and any evidentiary hearing must be held and an order entered within ninety (90) days of the date of this order. It is so ordered.

Id.

On August 8, 2007, Thompson filed his fifth postconviction motion, pursuant to this Court's July 2007 order. Thompson again raised the claim that Atkins, section 921.137, Florida Statutes, and Florida Rule of Criminal Procedure 3.203, prohibit Thompson's execution because he is intellectually disabled.[6] The

---

6. Thompson also raised three additional claims: (1) executing Thompson after thirty-one years on death row, particularly in light of his mental deficiencies, violates the Eighth and Fourteenth Amendments to the United States Constitution; (2) lethal injection violates the Eighth Amendment; and, (3) the September 17, 2006, American Bar Association Report evaluating the death penalty in Florida

- 10 -

postconviction court held a status conference on August 15, 2007, and then held a case management conference/<u>Huff</u>[7] hearing on August 22, 2007.  At the <u>Huff</u> hearing, the State responded to Thompson's intellectual disability claims, arguing that because Thompson failed to plead the elements of his intellectual disability claim in accordance with <u>Cherry</u>, the claim should be summarily denied.  On August 27, 2007, the postconviction court summarily denied Thompson's motion.  Noting that <u>Cherry</u> defines intellectual disability as having an IQ below 70, the trial court concluded in pertinent part:

> The motion filed August 8, 2007, <u>does not allege his IQ is under 70</u>.  To the contrary, the motion alleges his IQ is above 70 in numerous places.  In paragraph 8 of the motion, Defendant states his IQ was 75 in 1958 and that his IQ was 74 when he was in the second grade.  Both of these scores are above 70.  In paragraph 10, Defendant states that Dr. Dorita Marina found his IQ to be in the low average range.  Low average is above the range of mental retardation.  Low average is not mentally retarded.
>
> Even if Defendant's allegations are all taken as true, he does not allege the elements of mental retardation.  He does not allege that his IQ is under 70, nor does he allege an onset before age 18, as his IQ was 75 in 1958 and 74 when the Defendant was in second grade.  As he has not properly pled mental retardation, he is not entitled to a hearing under Fla. R. Crim. P. 3.203(e).

(Emphasis in original).

---

constitutes newly discovered evidence that Thompson's execution violates the Eighth and Fourteenth Amendments.  The trial court struck these claims as exceeding the scope of the remand and, on appeal, this Court summarily denied these claims as without merit.  <u>Thompson v. State</u>, Case No. SC07-2000 (Fla. Feb. 27, 2009).

7.  <u>Huff v. State</u>, 622 So. 2d 982 (Fla. 1993).

On appeal, this Court remanded for an evidentiary hearing by order dated February 27, 2009. In its order, this Court instructed the postconviction court to consider the requirements set forth in Cherry:

> Having reviewed the record in this case, including all prior proceedings, we reverse and remand for an evidentiary hearing on Thompson's mental retardation claim. In making a determination of whether Thompson meets the requirements of mental retardation, the trial court shall consider the requirements set forth in Cherry v. State, 959 So. 2d 702 (Fla. 2007):
>
> > [The defendant] must establish that he has significantly subaverage general intellectual functioning. If significantly subaverage general intellectual functioning is established, [the defendant] must also establish that this significantly subaverage general intellectual functioning exists with deficits in adaptive behavior. Finally, he must establish that the significantly subaverage general intellectual functioning and deficits in adaptive behavior manifested before the age of eighteen.
>
> Id. at 711. We express no opinion on the merits of his claim of mental retardation.

Thompson v. State, 3 So. 3d 1237, 1238 (Fla. 2009).[8]

On remand, the circuit court held an evidentiary hearing on April 13, 2009, and April 27, 2009. Thompson called three witnesses: (1) William Weaver, Thompson's eighth-grade teacher, (2) Dr. Faye Sultan, a psychologist retained by

_____

8. The term "intellectual disability" will now be used in place of "mental retardation." See Fla. R. Crim. P. 3.203.

- 12 -

Thompson to evaluate him for intellectual disability, and (3) Dr. Stephen Greenspan, a psychologist retained by Thompson to review the records of Thompson's mental testing, inform the court about proper procedures for evaluating intellectual disability, and testify regarding whether these procedures were followed in Thompson's case. The State called one witness: Dr. Greg Prichard, a psychologist retained by the State to evaluate Thompson for intellectual disability.

Weaver testified that Thompson struggled as a student, stating that Thompson was "the most academically challenged child I had." Weaver further testified that Thompson had difficulty performing school work, suffered from a speech impediment, had poor motor skills, and was clumsy. Weaver also reviewed Thompson's school records, which indicated IQ scores of 75 (1958), 74 (1959), 74 (1961), 79 (1963), 73 (1966), and 70 (1968). Weaver also testified that Thompson qualified as "educable mentally retarded," wanted to please, and was an absolute follower.

Dr. Faye Sultan, qualified as an expert in forensic psychology by the trial court, opined that Thompson was intellectually disabled. Dr. Sultan administered the WAIS-IV IQ test on March 20, 2009, with four relevant sub-tests. Thompson scored 83 on verbal comprehension, 81 on perceptual reasoning, 77 on working memory, and 56 on processing speed. Based on these data, Dr. Sultan concluded

that Thompson's full-scale IQ score fell in a range between 68 and 76 at a 95%

confidence interval.  The actual full-range IQ score calculated by Dr. Sultan was

71.

Dr. Sultan also evaluated Thompson's adaptive functioning by consulting

school records and interviewing witnesses who knew Thompson before his

incarceration, including Thompson's mother and wife.  Based on this information,

Dr. Sultan concluded that Thompson manifested adaptive behavior deficits, and

that these deficits manifested before the age of 18.  Dr. Sultan viewed these

findings as support for her conclusion that Thompson was intellectually disabled.

The State then called its witness, Dr. Greg Prichard, who was qualified as an

expert in forensic psychology.  Dr. Prichard administered the Stanford-Binet 5 IQ

test[9] to Thompson on April 6, 2009, with five relevant sub-tests.  Thompson scored

85 on fluid reasoning, 91 on knowledge, 86 on quantitative reasoning, 100 on

visual-spatial, and 86 on working memory.  Based on these data, Dr. Prichard

calculated Thompson's non-verbal IQ as 86, verbal IQ as 91, and full-scale IQ as

88.  After noting that this full-scale IQ is consistent with earlier IQ scores obtained

---

9. Dr. Prichard administered the Stanford-Binet 5 test, rather than the WAIS-IV test, due to concern for the "practice effect."  The practice effect causes an individual's IQ scores to rise if that individual was administered the same IQ test within one year.  According to Dr. Prichard, the Stanford-Binet 5 and WAIS-IV measure the same underlying attribute (IQ), but "go about it in very different ways," thus negating the practice effect.

by Thompson,[10] Dr. Prichard opined that Thompson was not intellectually disabled. Dr. Prichard did not perform a formal adaptive functioning evaluation, but based on "common-sense," his interactions with Thompson, and his review of Thompson's records, Dr. Prichard opined that Thompson's ability to enlist in the Marines, obtain his GED, and work as a security guard, cook, roofer, and truck driver is consistent with an absence of intellectual disability.

Dr. Prichard further opined that although there was no problem with the raw data obtained by Dr. Sultan, Dr. Sultan's diagnosis of intellectual disability was inappropriate, because Thompson's full-scale IQ score was only pulled down by a single outlying score on the processing speed sub-test. According to Dr. Prichard, this indicated a possible learning disability or attention deficit issue, not intellectual disability.

Finally, Thompson called Dr. Stephen Greenspan, who was qualified as an expert witness on intellectual disability and psychology. However, Dr. Greenspan testified that he never actually evaluated Thompson, and thus could not diagnose Thompson as intellectually disabled. The trial court precluded Dr. Greenspan from testifying on the basis that he had never actually evaluated Thompson, and the trial court did not consider his opinion regarding the issue of Thompson's intellectual

_____

10. Thompson received an IQ score of 85 in 1987 and 82 in 1988.

disability. According to the trial court, allowing Dr. Greenspan's testimony would constitute buttressing another expert's opinion.

The trial court did, however, permit Thompson's counsel to proffer the intended content of Dr. Greenspan's testimony. According to counsel, Dr. Greenspan would have opined that Dr. Sultan's methodology "was more supported by the facts and data than [that of] Dr. Prichard." Further, Dr. Greenspan would have testified that Dr. Prichard did not do a complete evaluation, did not take the "practice effect" into account, and did not correctly use the applicable professional guidelines.

The circuit court issued an order on May 21, 2009, denying Thompson's motion for relief. The circuit court concluded that Thompson "failed to prove by clear and convincing evidence that he is [intellectually disabled]." The circuit court relied heavily on this Court's bright-line cutoff score of 70, established in Cherry, noting that even the defense expert's examination of Thompson yielded an IQ of 71, "which is above the threshold of 70." The court also concluded that because of the IQ scores above 70 collected throughout Thompson's childhood, "[the defense expert's] opinion takes in less than the whole picture, only a small part of it." The court also rejected Thompson's argument that Cherry should be rejected as wrongly decided.

Thompson appealed. On appeal, this Court affirmed the order of the circuit court, stating:

> Having reviewed the full record in this case and the circuit court's factual findings, we hold that there is competent, substantial evidence to support the circuit court's factual findings that Thompson is not mentally retarded, based on this Court's definition of the term as set forth in Cherry. In fact, Thompson's full-scale IQ scores on standardized tests administered from 1987 through 2009 were generally over 80: in 1987, Dr. Carbonnel administered the Wechsler Adult Intelligence Scale (WAIS)-Revised Edition, where Thompson's full-scale IQ was scored as 85 (Verbal Performance IQ: 87; Performance IQ: 84); in 1988, Dr. Marina administered the WAIS-Revised Edition, where Thompson's full-scale IQ was scored as 82 (Verbal IQ: 85; Performance IQ: 80); in 2009, Dr. Sultan administered the WAIS-Fourth Edition, where Thompson's full-scale IQ was scored as 71 (Verbal Comprehension: 83; Perceptual Reasoning: 81; Working Memory: 77; Processing Speed: 56); and also in 2009, Dr. Prichard administered the Stanford-Binet-Fifth Edition, where Thompson's full-scale IQ was scored as 88 (Verbal IQ: 91; Non-Verbal IQ: 86).

Thompson v. State, 41 So. 3d 219, 2010 WL 1851473, at *1 (Fla. 2010).

On May 26, 2015, Thompson filed his seventh motion for postconviction relief, the motion at issue in this case, in the circuit court, raising one issue: that Thompson's death sentence violated the Eighth and Fourteenth Amendments pursuant to Atkins, 536 U.S. 304, and Hall, 134 S. Ct. 1986. In that motion, Thompson argued that he was intellectually disabled and therefore ineligible for execution pursuant to Atkins and Hall. Thompson claimed that his 2009 initial hearing on intellectual disability was not a full and fair hearing because he could not put forth a below-70 IQ score and because the trial court was relying on this

- 17 -

Court's decision in <u>Cherry</u>.  Thompson asserted that even though his IQ scores may have been higher than 70, when considered together with his deficits in adaptive functioning, he could actually meet the definition of intellectual disability. Moreover, Thompson argued, it was clear that the circuit court did not consider the two other prongs of the intellectual disability test, because while the court spent more than four pages of its order explaining how Thompson failed to prove the first prong, its only mention of prongs two and three was one paragraph on the last page of the order.  Finally, Thompson argued that under a <u>Witt</u> analysis, <u>Hall</u> should be retroactively applied to his case.

After a short hearing, at which no evidence was presented, the circuit court issued an order summarily denying Thompson's motion, stating that <u>Hall</u> did not create a new right and only required that courts consider the statistical error margin in determining IQ.  The court held that <u>Hall</u> has no effect on individuals who were previously found not to be intellectually disabled because they did not have deficits in adaptive functioning or onset of intellectual disability prior to the age of 18. The court reasoned that it was sufficient under <u>Hall</u> that Thompson was afforded a full and complete evidentiary hearing in 2009 and had the opportunity to present evidence of intellectual functioning, deficits in adaptive functioning, and onset prior to the age of 18.

Because Thompson's IQ scores were generally over 80, and <u>Hall</u> only required courts to look at IQ scores of 75 and below, Thompson did not meet the first prong of the intellectual disability test. In finding that Thompson also failed to prove deficits in adaptive functioning, the court noted the testimony of the state's expert at the evidentiary hearing that Thompson was able to get into the military and work as a security guard. Finally, the court found that Thompson also failed to show onset before the age of eighteen because of the above factors. Thompson appealed.

**ANALYSIS**

It is clear that Thompson's previous hearing on intellectual disability was tainted by the bright-line cutoff of 70 for IQ scores established by this Court in <u>Cherry</u>, which was abrogated by <u>Hall</u>. By order dated February 27, 2009, this Court held that Thompson was entitled to an evidentiary hearing regarding his intellectual disability claim. <u>Thompson v. State</u>, 3 So. 3d 1237 (Fla. 2009). In so holding, this Court stated: "In making a determination of whether Thompson meets the requirements of mental retardation, the trial court shall consider the requirements set forth in <u>Cherry v. State</u>, 959 So. 2d 702 (Fla. 2007) . . . ." <u>Id.</u> at 1238.

The circuit court cited <u>Cherry</u> numerous times in its 2009 order finding that Thompson had failed to prove he was intellectually disabled:

- 19 -

Counsel for Defendant argued that Dr. Pritchard [State's expert] was remiss for having failed to test adaptive functioning. Dr. Prichard explained that since the Defendant's IQ was above 2 standard deviations below the mean, and all 3 prongs of the test must be met, there was no need to test further. "Because we find that Cherry does not meet this first prong of section 921.137(1) criteria, we do not consider the two other prongs of the mental retardation determination." Cherry, 959 So. 2d at 741.

In affirming the circuit court's 2009 order denying Thompson's intellectual disability claim, this Court stated:

Having reviewed the full record in this case and the circuit court's factual findings, we hold that there is competent, substantial evidence to support the circuit court's factual findings that Thompson is not mentally retarded, based on this Court's definition of the term as set forth in Cherry.

Thompson v. State, 41 So. 3d 219, 2010 WL 1851473, at *1.

The circuit court summarily denied Thompson's 2015 motion for postconviction relief, in which Thompson argued his right to a new intellectual disability hearing pursuant to Hall, stating:

Hall v. Florida, 134 S. Ct. 1986 (2014), does not create a new right. The effect of the opinion is that the courts must consider the statistical error margin in determining IQ. It has no effect on individuals who were previously found not to be mentally retarded, now called intellectually disabled, due to a lack of deficits in adaptive functioning, and onset of the intellectual disability prior to the age of 18. . . .

In this case the Defendant was afforded a full and complete evidentiary hearing on the question of whether or not he is intellectually disabled. During the extensive two-day evidentiary hearing, the Defendant, through counsel, was afforded the opportunity to present evidence of his intellectual functioning (numerous expert

- 20 -

and non-expert witnesses), as well as evidence of any deficits in adaptive functioning and whether there was an onset of an intellectual disability prior to the age of 18.

As this Court stated in Oats, Hall did not just require that courts consider the statistical error margin in determining IQ, it also changed the manner in which intellectual disability evidence must be considered: "courts must consider all three prongs in determining an intellectual disability, as opposed to relying on just one factor as dispositive . . . because these factors are interdependent, if one of the prongs is relatively less strong, a finding of intellectual disability may still be warranted based on the strength of other prongs." 181 So. 3d at 467-68. In Hall, the United States Supreme Court made clear that the assessment for intellectual disability is a "conjunctive and interrelated assessment." 134 S. Ct. at 2001. Therefore, it is not enough that a defendant be allowed to present evidence on all three prongs of the intellectual disability test.

Although Thompson did present some evidence relating to all three prongs of the intellectual disability test, he did not receive the type of conjunctive and interrelated assessment that Hall requires. Thompson has had a broad range of IQ scores from his childhood through adulthood. In 1958, at age 5, Thompson received a full-scale IQ score of 75 on the Stanford-Binet test, in 1961, at age 8, he received a full-scale IQ score of 74 on the same test. In 1987, Thompson was

found to have a full-scale IQ score of 85 on the WAIS-R test, and in 1988 he received a full-scale IQ score of 82 on the same test.

Most recently, in 2009, in preparation for his initial hearing on intellectual disability, Thompson received a full-scale IQ score of 71 from the defense expert, and a full-scale IQ score of 88 from the State expert, on the WAIS-IV and Stanford-Binet tests, respectively. The trial judge could have determined the defense expert—who, after assessing Thompson to have an full-scale IQ score of 71 and finding significant deficits in adaptive functioning, expressed his opinion that Thompson was intellectually disabled—was credible, but was bound by Cherry's bright-line cutoff of 70. As the circuit court stated: "[Thompson's] own expert, Dr. Sultan testified that his IQ is 71, which is above the threshold of 70."

At his initial intellectual disability hearing, Thompson attempted to introduce the testimony of intelligence testing expert, Dr. Greenspan, in the hope that the expert could more fully explain the range of Thompson's IQ scores in relation to his adaptive functioning, including how significant deficits in adaptive functioning can affect a full-scale IQ score. Thompson proffered that this evidence could have been used to counteract the seemingly high full-scale IQ score of 88 found by the State's expert, who admittedly never tested Thompson's adaptive functioning nor considered that information because of the bright-line cutoff of 70

announced in <u>Cherry</u>. However, this expert was excluded by the circuit court because he had not personally examined Thompson.

Simply put, it is impossible to know the true effect of this Court's holding in <u>Cherry</u> on the circuit court's review of the evidence presented at Thompson's intellectual disability hearing, particularly on Thompson's range of IQ scores from 71-88. What is clear is that this Court instructed the circuit court to conduct Thompson's intellectual disability hearing pursuant to <u>Cherry</u>, a case that has since been abrogated by the United States Supreme Court in <u>Hall</u>. The circuit court took <u>Cherry</u> into consideration at Thompson's intellectual disability hearing and in denying Thompson's intellectual disability claim, and this Court relied on <u>Cherry</u> to affirm the circuit court's order. Because of this reliance on <u>Cherry</u>'s bright-line cutoff of 70 for IQ scores, Thompson has yet to have "a fair opportunity to show that the Constitution prohibits [his] execution." <u>Hall</u>, 134 S. Ct. at 2001.

## CONCLUSION

Accordingly, we reverse and remand Thompson's case back to the circuit court for a new evidentiary hearing regarding intellectual disability, to be conducted pursuant to the United States Supreme Court's holding in <u>Hall</u>, and this Court's holding in <u>Oats</u>.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and PERRY, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

For the reasons I have explained in my dissent in <u>Walls v. State</u>, No. SC15-1449, 2016 WL 6137287 (Fla. Oct. 20, 2016) (Canady, J., dissenting), I have concluded that <u>Hall v. Florida</u>, 134 S. Ct. 1986 (2014), should not be given retroactive effect.  I would therefore deny Thompson relief.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Miami-Dade County,
     Marisa Tinkler-Mendez, Judge - Case No. 131976CF003350B000XX

Marie-Louise Samuels Parmer, Special Assistant, Michael Chance Meyer, and Brittney Nicole Lacy, Staff Attorneys, Capital Collateral Regional Counsel – South, Fort Lauderdale, Florida,

     for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Marilyn Muir Beccue, Assistant Attorney General, Tampa, Florida,

     for Appellee