921 So.2d 560 (2005)
David B. SNELGROVE, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-2242.
Supreme Court of Florida.
November 10, 2005.
Rehearing Denied February 10, 2006.
*562 James S. Purdy, Public Defender, James R. Wulchak, Chief Appellate Division, Assistant Public Defender and Larry B. Henderson, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
David Snelgrove was convicted of two counts of first-degree murder, one count of robbery with a deadly weapon, and one count of burglary of a dwelling with battery. He was sentenced to death on both first-degree-murder convictions. He now appeals his convictions and his two death sentences.[1] We affirm the convictions, but we reverse the death sentences and remand for a new penalty-phase proceeding because the trial court erred in permitting the jury to render only a single, undifferentiated advisory sentence rather than individualized advisory sentences for each capital murder conviction.

I. BACKGROUND
On Sunday, June 25, 2000, Glyn and Vivian Fowler were found dead in their home. The elderly couple had been brutally beaten and stabbed to death, as evidenced by multiple fractures and stab wounds spread throughout their bodies. Ultimately, Vivian died from a stab wound to the heart, and Glyn died of a brain injury caused by blunt force trauma to the head.
Evidence at the crime scene and in the surrounding area linked David Snelgrove, the twenty-seven-year-old nephew of one of the Fowlers' neighbors, to the murder. Snelgrove had recently moved in with his aunt and his cousin, Jeff McCrae, after being expelled from a drug rehabilitation program. Blood droplets matching Snelgrove's DNA were found throughout the house, as were bloody fingerprints and footprints matching Snelgrove's. A trained bloodhound followed a scent from the blood on the Fowlers' broken window to Snelgrove, and the police recovered a knife in the woods next to the Snelgrove home with blood matching Snelgrove's DNA.
Snelgrove denied any involvement with the murder. On the day the Fowlers' bodies were discovered, the Flagler County Sheriff's Office questioned Snelgrove *563 about his activities that weekend and the cause of the cut on his hand. Snelgrove claimed he and Jeff McCrae had spent Friday evening at Don Silva's home.[2] Around 12:30 a.m., he and McCrae left Silva's together, and Snelgrove claimed he spent the rest of the night at home. He attributed the cut on his hand to an accident that occurred on Monday, June 19, the last day of his landscaping job.
At trial, Jeff McCrae presented a different version of events. He testified that he and Snelgrove arrived at Silva's separately on Friday, June 23, and they left together at approximately 12:30 a.m. On the way back to their house, they stopped to purchase crack cocaine. He did not notice any cuts or bandages on Snelgrove's hand at that time. During the middle of the night, McCrae awoke to the sound of someone entering his house. He arose to find Snelgrove in the bathroom cleaning a cut on his hand and wiping what appeared to be blood from his leg and foot. Snelgrove stated that he had been in a fight, but he refused McCrae's offer to take him to the hospital. Instead, he wrapped his hand in what was possibly a shirt,[3] and told McCrae that he wanted to get more cocaine. The two went to purchase cocaine from a man named "Kimo" (Cornelius Murphy). McCrae testified that the money used to buy the cocaine had blood on it. Later that night, police stopped "Kimo" at a Jiffy Food Store after he attempted to make a purchase with blood-stained money. DNA tests on one of the bills showed that the blood matched Snelgrove's DNA.
Two other witnesses also testified to the events of Friday night and the cause of the cut on Snelgrove's hand. Snelgrove's supervisor at the landscaping job testified that he did not notice any injury when he paid Snelgrove for his last day of work on Monday, June 19.[4] Snelgrove's neighbor, Hans Reinholz, testified that when he met Snelgrove and shook hands with him, around 11:15 p.m. on Friday, June 23, he did not notice any cuts or bandages.
McCrae also testified that on Saturday, June 24, he and Snelgrove visited a number of pawn shops in an attempt to get cash. At one of the shops, McCrae waited in the car while Snelgrove allegedly went in to pawn an old fishing rod that a number of pawn shops had already rejected. Snelgrove returned with the fishing rod, but later a clerk at Value Pawn testified that Snelgrove pawned a necklace belonging to Vivian Fowler. Fingerprints on the necklace matched Snelgrove's.
Additional testimony came from Gary Matthews, an inmate at the Flagler County Jail, where Snelgrove was detained when he was arrested on June 25. Mathews alleged that Snelgrove made critical admissions to him. Hoping to secure a *564 deal with the State on charges he faced, Matthews first wrote a letter to Irwin Connelly, the public defender representing him at the time Snelgrove was arrested. This letter informed Connelly that Matthews had information about a "certain case."[5] Connelly withdrew from representing Matthews on June 28, the day after receiving the letter. Matthews also wrote two letters to the state attorney's office. The first was written on June 28. The State did not disclose this letter to the defense until after the guilt phase was complete. However, this letter was substantively the same as a second letter written by Matthews on July 20, which the State did disclose to the defense before trial. The July 20 letter informed the State that Matthews might have information that could save them "some legwork" and aid in Snelgrove's prosecution.
At trial, Matthews testified to his jail-house conversations with Snelgrove. Specifically, Matthews testified that Snelgrove told him of a cooperative effort between him and McCrae to break into the Fowlers' home and rob them of cash that the elderly couple kept in their bedroom. According to Matthews, Snelgrove claimed he knew of this money because he had borrowed money from the Fowlers in the past, and he was in need of money because another neighbor had refused his request for a loan. Snelgrove allegedly told Matthews that with McCrae acting as his lookout, Snelgrove broke a window with his hand and entered the house. He found his way to the master bedroom, but Glyn Fowler startled him before he could find the dresser where the money was kept. Glyn began to fight, and Snelgrove reported to Matthews that he beat and stabbed Glyn to death. In the commotion, Vivian awoke, and he beat and stabbed her as well. Matthews further testified that Snelgrove expressed remorse at his failure to look to the left when he entered the bedroom. If he had done this, he would have seen Vivian's purse, and he could have taken it without having to kill the victims.
Defense counsel first responded to Matthews' direct testimony by attempting to impeach him. He established that Matthews had pled guilty to all three charges for which he was being held (i.e., burglary, petit theft, and assault).[6] He also confronted Matthews with inconsistent statements made at deposition in which Matthews claimed he did not remember anything Snelgrove told him. Matthews responded by acknowledging he had lied during deposition because he felt he "got messed around by the detectives and the State."
Defense counsel also offered a defense to the State's case. It admitted to the burglary, but denied the murders. Specifically, the defense claimed that Snelgrove did, indeed, enter the Fowlers' home through the broken window, but only after the Fowlers had been killed by someone else. In the process of coming through *565 the window, Snelgrove cut his hand. Defense counsel claimed that the State's failure to find the Fowlers' blood mixed with Snelgrove's affirmed this defense. Alternatively, defense counsel argued that if the jury were to find Snelgrove guilty of murder, the evidence did not support premeditation.
The jury rejected both arguments. It found Snelgrove guilty of two counts of first-degree murder, one count of robbery with a deadly weapon, and one count of burglary of a dwelling with battery. On the two counts of first-degree murder, the jury found Snelgrove guilty of both premeditated and felony murder. In the penalty phase, the jury recommended the sentence of death by a vote of seven to five.[7] However, this recommendation did not individually address the two capital murder convictions for which Snelgrove was to be sentenced. Instead, the undifferentiated recommendation was: that "[a] majority of the jury, by a vote of 7/5, advise and recommend to the court that it impose the death penalty upon David B. Snelgrove."
The circuit court sentenced Snelgrove to death on both capital murder convictions, and this appeal timely followed.

II. ISSUES
Snelgrove raises nine points on appeal: (1) that the circuit court erred in denying his public defender's motion to withdraw based on a conflict of interest; (2) that the circuit court failed to conduct a Richardson[8] inquiry into an alleged discovery violation by the State, and, relatedly, that the State violated Brady[9] by withholding the information; (3) that the prosecuting attorneys made improper and inflammatory remarks that rendered the trial fundamentally unfair; (4) that the circuit court erred in denying his motion to briefly recess the penalty phase at the close of the jury-charge conference, prior to closing arguments, due to the mental and physical exhaustion of his counsel; (5) that his two death sentences are invalid because the jury rendered only a single, undifferentiated recommendation of death; (6) that his death sentences are unconstitutional because Florida's capital-sentencing scheme puts a higher burden of persuasion on the defendant to prove that a life sentence is appropriate than it puts on the State to prove that a death sentence is appropriate; (7) that his death sentences are unconstitutional and invalid because the circuit court considered improper aggravating factors, failed to consider or properly weigh highly relevant mitigating factors, and improperly found that the aggravating factors outweighed the mitigating factors; (8) that his death sentences are unconstitutional and invalid because the jury was tainted by highly inflammatory and improper victim-impact evidence; and (9) that his death sentences are unconstitutional because Florida's capital-sentencing scheme violates the Sixth Amendment as interpreted in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
As explained below, we hold that Snelgrove's claims relating to the guilt phase of his trial are without merit. We therefore affirm his convictions.[10] However, the sentences *566 cannot be affirmed. We hold that the two death sentences are invalid because the jury returned only a single, undifferentiated advisory sentence. Therefore, we reverse Snelgrove's two death sentences and remand the case to the circuit court for a new penalty-phase proceeding at which the jury must render individualized sentencing recommendations for each capital murder conviction. In light of this disposition, we do not address the other claims related to the penalty phase.

III. DISCUSSION

A. Public Defender's Motion to Withdraw
Snelgrove's contention that the trial court erred in denying defense counsel's motion to withdraw is without merit. The fact that the State's key witness was, at one time, represented by the same public defender's office as Snelgrove is not grounds for reversal in this case. Of the three cases cited by the defendant, only Ortiz v. State, 844 So.2d 824 (Fla. 5th DCA 2003), actually considers whether such a situation creates a conflict of interest, and Ortiz is distinguishable. The other cases hold that the trial court did not adequately consider the issue. Furthermore, there is insufficient evidence that a conflict actually manifested itself at trial. Matthews expressly waived his attorney-client privilege, and defense counsel's ability to aggressively cross-examine Matthews was unimpaired. Therefore, we find the defendant's argument to be without merit.
Ortiz is the only case cited in which an appellate court disagreed with the trial court's substantive finding that a conflict did not exist. The other cases cited by the defendant, i.e., Lee v. State, 690 So.2d 664 (Fla. 1st DCA 1997), and Thomas v. State, 785 So.2d 626 (Fla. 2d DCA 2001), focus upon the procedural process. They disapprove of a trial court's failure to adequately inquire into whether a conflict existed. In this case, the trial court conducted an in-camera hearing to consider defense counsel's motion to withdraw;[11] therefore, there are no procedural concerns and these two cases do not apply.
Moreover, Ortiz is distinguishable. In Ortiz, the Fifth District recognized the potential conflict of interest that may arise when the public defender's office represents both the defendant and the State's key witness. The court stated:
To deny a motion for separate representation, where a risk of conflicting interest exists, is reversible error. There exists a risk of conflicting interest in the instant case as the State's key witness against Ortiz, the confidential informant, was also being represented by the Office of the Public Defender. It cannot be *567 said that the apparent conflict created when defense counsel represented both appellant Ortiz and the State's key witness is not prejudicial to Ortiz so as to have denied him his right to effective assistance of counsel.
844 So.2d at 825-26 (internal quote marks and citations omitted). In Snelgrove's case, the public defender's office did not represent Matthews at the time of trial. In fact, Connelly, the assistant public defender who represented Matthews when Snelgrove was first arrested withdrew almost immediately after learning Matthews had information about Snelgrove's case.[12]
Furthermore, the record does not support the appellant's assertion that his trial counsel labored under a conflict of interest or was otherwise affected by his office's prior representation of Matthews. While trial counsel stated that he knew Matthews was facing more serious charges than those initially pled to because his office represented him in a prior case, there is no evidence that this knowledge compromised Snelgrove's right to effective assistance of counsel. As previously stated, the simultaneous representation in question lasted for a very short period of time at the outset of the case, and at trial, Matthews waived any attorney-client privilege before testifying. Moreover, defense counsel was not impaired in his ability to aggressively question and impeach Matthews on cross-examination.

B. Richardson/Brady Claim
Snelgrove's allegation regarding the failure to conduct a Richardson hearing is also without merit. Because this claim was raised at the Spencer[13] hearing, we earlier determined that, procedurally, it should be analyzed under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), not Richardson. Therefore, by order dated April 14, 2005, we remanded the claim to the trial court to consider this issue under Brady. The trial court held a hearing and found no Brady violation. We affirm.
Richardson mandates that once a discovery violation is revealed, the trial court must conduct an inquiry to determine the sanctions that should be imposed on the violating party. See, e.g., C.D.B. v. State, 662 So.2d 738, 741 (Fla. 1st DCA 1995). While the State's failure to disclose Matthews' June 28 letter clearly violated its duty to disclose, this failure was not revealed until after the guilt phase was complete and the jury had issued its advisory recommendation in the penalty phase. For this reason, Brady provides the more appropriate standard for analysis.[14]
Brady requires the State to disclose material information within the State's possession or control that tends to negate the guilt of the defendant. 373 U.S. at 87, 83 S.Ct. 1194. Establishing a Brady violation requires the defendant to show: (1) that the evidence at issue is favorable to him, either because it is exculpatory or because *568 it is impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the suppression resulted in prejudice. Rogers v. State, 782 So.2d 373, 378 (Fla.2001) (citing Strickler v. Greene, 527 U.S. 263, 280-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).
We affirm the trial court's finding that the State's failure to disclose the June 28 letter does not warrant relief under Brady. While this letter provided favorable evidence to the defense, in that it was impeaching, and the State erred in failing to disclose it, the defendant has failed to establish that this suppression prejudiced him.[15] The June 28 letter presented evidence already known to the defendant. Before trial, defense counsel had the June 27 letter Matthews sent to the public defender's office indicating his intent to testify against Snelgrove. The State had also provided the defendant with the July 20 letter that Matthews had sent to the state attorney, and the substance of this letter was essentially the same as the June 28 letter. Additionally, defense counsel used both the June 27 and the July 20 letters to impeach Matthews at trial. In fact, it used the June 27 letter for the same purpose appellant claims he would have used the June 28 letter  to question Matthews' credibility by pointing out a discrepancy between his statements that Snelgrove did not immediately confide in him and the timing of the letter.

C. Improper Arguments and Statements by Prosecuting Attorneys
Snelgrove also complains of a number of improper statements and arguments made by the prosecuting attorneys throughout the trial.[16] First, we consider the improper arguments Snelgrove objected to at trial, and we find that even if the trial court improperly overruled defense counsel's objection to these statements, this error was harmless. Dessaure v. State, 891 So.2d 455, 465 n. 5 (Fla.2004) ("We recognize that the proper standard of review for an overruled defense objection is a harmless error standard."). Second, we analyze the arguments and statements that were not objected to at trial. These require us to consider whether fundamental error warrants a reversal, and we find it does not.

1. Complained-of Comments Preserved for Review

During the guilt phase, Snelgrove objected to two arguments made by the state attorney during the State's guilt phase closing argument. The first alleged that Snelgrove was attempting to transfer blame to the victim:
Hmm. You know, it's funny. No one ever wants to take responsibility even *569 when they do the worst. Shouldn't have happened that way. Shouldn't have happened that way. Oh, my gosh, look where I am. If they had only stayed asleep, I'd have never killed them. If I'd have only found the purse right away and snuck back out the window, I'd have never had to kill them.
Defense counsel objected to this on the basis that it was irrelevant and unduly inflamed the jury. The second argument also occurred during closing arguments, and it spoke to the truth of Matthews' testimony:
You know [Matthews] was telling the truth. Hmm. You can tell. You can tell better than I can, 12 of you can. Take your 12 years of experience and pool it. That man was telling the truth. And he knew things that only the killer would know, the kind of stuff that doesn't show up in the paper.
Defense counsel claimed these statements were unsupported by the facts as there was no evidence that Snelgrove's admissions, as testified to by Matthews, did not appear in the newspaper. The trial court overruled both objections.
Even if these arguments were improper and defense counsel's objections to them should have been sustained, we conclude that the trial court's failure to do so was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986) (recognizing that an impermissible statement is harmless when, in light of all the evidence presented, there is no reasonable probability that the statement contributed to the verdict).

2. Complained-of Comments Not Preserved for Review

Three non-penalty phase comments that Snelgrove complains of on appeal were not properly preserved for review. These comments warrant reversal only if Snelgrove establishes that admitting them constituted "fundamental error" that leads us to question the "validity of the trial itself." Card v. State, 803 So.2d 613, 622 (Fla.2001). We find no such error; therefore, we find no merit in these complaints.
First, Snelgrove complains of an improper interjection by the state attorney during defense counsel's closing arguments. In response to hypothetical questions defense counsel posed to the jury, the state attorney interjected: "Your Honor, I'd be glad to offer a scenario if you would like." The court immediately told the state attorney that that would be out of order. No objection or request for a mistrial was made.
Second, Snelgrove argues that the State improperly "coached" Matthews while making a "speaking objection." During his cross-examination of Matthews, defense counsel asked Matthews if his testimony was that Snelgrove "went out ... the back door." Matthews responded affirmatively and then said, "He went out the way he came in as far as I know." Defense counsel then asked, "So he ... came in the back door." Matthews again responded affirmatively, and the State objected that defense counsel was "trying to put words in the mouth of the witness. What Mr. Snelgrove said is he went out the way he came in." (Emphasis added.) Matthews then responded: "That's what I was fixing to say."
Lastly, Snelgrove argues that the State made an improper argument about facts not in evidence during the State's closing argument. In response to the defense argument that none of the victims' blood had been found on the knife, the State made the following statement:
I'd like to answer [defense counsel's] assertions that the fact that there did not appear to be any mixture of the *570 victims' blood with their killer is reason to believe he didn't kill them.
A considerable amount of blood was sampled, a considerable amount of DNA was collected, but I think one of the  probably the best examples is the knife. They took a small scraping, and they found David Snelgrove's blood on it. That was it.
Does anyone here not believe that this was the murder weapon? This weapon was plunged into the heart of Mrs. Fowler, and it was plunged into Mr. Fowler five times or more. Their blood wasn't on it, according to the Defense, but that's not what the evidence said.
The evidence says that David Snelgrove's blood was on it in the sample they took, the scraping. It doesn't say that no one else's blood was on it. And the fact that they didn't scrape the entire knife and take every piece of blood off of it doesn't mean that this wasn't the murder weapon.
This statement was not followed by an objection, and so we review it only for fundamental error.[17]
Whether viewed individually or collectively, none of these statements or arguments was so fundamentally improper that their utterance "reache[d] down into the validity of the trial itself to the extent that a verdict of guilty ... could not have been obtained without the assistance of the alleged error." See Card, 803 So.2d at 622. Snelgrove, therefore, is not entitled to relief on this claim.

D. Sufficiency of the Evidence
Although Snelgrove has not challenged the sufficiency of the evidence in this case, we independently review the evidence to determine whether sufficient evidence exists to support a first-degree murder conviction. See Mansfield v. State, 758 So.2d 636, 649 (Fla.2000). After reviewing the record, and particularly the facts set out in part I of this opinion, we conclude that Snelgrove's first-degree murder convictions are supported by competent, substantial evidence.

E. Single Advisory Sentence
While substantial evidence supports Snelgrove's conviction in the guilt phase, we find that the single, undifferentiated death recommendation in this case warrants a new penalty-phase proceeding. In Pangburn v. State, 661 So.2d 1182, 1188 (Fla.1995), we held that Florida's death penalty scheme requires a separate jury recommendation for each count of first-degree murder. Contrary to the State's arguments, the harmless-error rule does not apply.[18] Since Snelgrove received a single, undifferentiated death recommendation for two counts of first-degree murder, we reverse and remand for a new penalty-phase proceeding.
In Pangburn, 661 So.2d at 1190, we reversed the defendant's death sentence and remanded for a new penalty-phase proceeding because the jury rendered a single, undifferentiated death recommendation in a case where the defendant had been convicted of two counts of first-degree *571 murder.[19] We noted that Florida's capital-sentencing statute "clearly addresses [the jury's] advisory sentence as it pertains to a single murder," and that juries frequently render different recommendations for different counts. Id. at 1188 (citing § 921.141(1), (2), Fla. Stat. (1991)). While we did not directly address the State's argument that the harmless-error rule should apply, the language of the opinion suggests that it does not. Pangburn speaks in absolute terms, holding that it "would undermine our sentencing procedure" to allow a jury to render a single recommendation in a case like this. Pangburn, 661 So.2d at 1188.
The potential for unreliability in the imposition of the death penalty is too great to subject general jury recommendations of death to harmless-error analysis. This is true for several reasons. First, as we explained in Pangburn, aggravating and mitigating circumstances that apply to one count may not apply to another, leading jurors on occasion to recommend death for one murder and life for another. See id. Second, in Florida, the judge and jury are considered cosentencers, see Kormondy v. State, 845 So.2d 41, 54 (Fla.2003), and a recommendation of life must be accorded great weight by the sentencing judge. See Tedder v. State, 322 So.2d 908, 910 (Fla.1975). Third, general sentences that do not distinguish between individual counts are prohibited in Florida. See Dorfman v. State, 351 So.2d 954, 957 (Fla.1977). General sentences create uncertainty because it cannot be determined that the same sentence would have been imposed if one of the crimes had not been committed. Therefore, if one conviction that is part of a general sentence is reversed, the entire sentence must be vacated. See id. This is a particularly trenchant concern in capital cases, in which a new penalty phase can be expensive and time-consuming. With an individual recommendation on each count, one death sentence may be affirmed even if another is reversed. See, e.g., Buckner v. State, 714 So.2d 384, 386 (Fla.1998) (affirming death sentence on one count and reversing death sentence on second count). Lastly, juries sometimes recommend the death penalty for multiple murders by a different vote on each count. The vote breakdown can be a useful consideration in determining whether error during the penalty phase is harmful and therefore reversible. See Mahn v. State, 714 So.2d 391, 398 (Fla.1998) (noting that death recommendation was by eight-to-four vote in holding error in finding cold, calculated, and premeditated aggravator was not harmless); Preston v. State, 564 So.2d 120, 123 (Fla. 1990) (observing that jury recommended death by one-vote margin in reversing death sentence after prior conviction relied upon for aggravating factor was vacated). With no count-by-count vote breakdown, this aspect of our analysis is impossible.
Because the potential for unreliability is so great in general recommendations for the imposition of the death penalty, we hold that a Pangburn violation is not subject to a harmless-error test. Rather, such an error requires per se reversal.
Therefore, Snelgrove is entitled to a new penalty-phase proceeding at which the jury must make individualized recommendations *572 on each capital count for which he is to be sentenced.

IV. CONCLUSION
For the reasons expressed above, we affirm Snelgrove's convictions but reverse his two death sentences. We remand the case to the circuit court to conduct a new penalty-phase proceeding at which the jury must render separate advisory sentences for each of Snelgrove's capital murder convictions.[20]
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.
[2] Don Silva is a friend of Jeff McCrae.
[3] In the attic of the Snelgrove home, the police discovered a bag with two bloody t-shirts. The bag smelled of ammonia. Blood samples from the t-shirts matched Snelgrove's DNA profile. Two pairs of blood-stained shorts were also found in the Snelgrove home. Blood samples from the shorts revealed a mixture of DNA: Snelgrove was determined to be the primary contributor; the testing was unable to exclude Jeff McCrae as a possible secondary contributor.
[4] There was a disagreement at trial regarding whether the supervisor paid Snelgrove in cash or by a check. Snelgrove first testified that he was paid in cash on Monday, June 19, but he later changed the story to claim he received a check that he cashed on Saturday, June 24. Snelgrove's supervisor claimed he paid Snelgrove in cash on his last day of work. Hans Rheinholz, Snelgrove's neighbor, testified that Snelgrove approached him around 11:15 p.m. on Friday, June 23, to ask him to cash a check for him, and Reinholz refused.
[5] Matthews could not remember the date he sent this letter. He denied sending it on June 25, the day Snelgrove was arrested and first held, because he claims Snelgrove did not open up on the first day. He testified that "it had to be a couple days after [Snelgrove] entered the cell" before he wrote the letter. Connelly responded to the letter by filing a motion to withdraw on June 28, and an attorney outside the public defender's office was appointed to represent Matthews.
[6] Matthews denied this, claiming the assault charge had been dropped, but the court file indicated otherwise. He also acknowledged that he initially raised this information in hopes of securing a deal, but he had not received one because the State "had thr[o]w[n] [him] to the dogs."
[7] In light of our holding that Snelgrove is entitled to a new penalty-phase proceeding, we will not recount the evidence and testimony that was presented at the penalty phase.
[8] Richardson v. State, 246 So.2d 771 (Fla. 1971).
[9] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[10] The only claim regarding the guilt-phase proceedings that had potential merit was the second, as the trial court should have considered whether the State's suppression of the June 28 letter violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). By order dated April 14, 2005, we temporarily relinquished jurisdiction to the trial court to consider this claim. The trial court found that the suppression did not meet the standard in Brady, and we affirm.
[11] Guzman v. State, 644 So.2d 996 (Fla. 1994), which would have required the trial court to grant a motion to withdraw upon certification from the public defender that a conflict of interest existed, is no longer good law. Section 27.5303(1)(a), Florida Statutes (2004), now allows the trial court to

inquire or conduct a hearing into the adequacy of the public defender's representations regarding a conflict of interest without requiring the disclosure of any confidential communications. The court shall deny the motion to withdraw if the court finds the grounds for withdrawal are insufficient or the asserted conflict is not prejudicial to the indigent client.
§ 27.5303(1)(a), Fla. Stat. (2004); see also Valle v. State, 763 So.2d 1175, 1177 (Fla. 4th DCA 2000).
[12] At oral argument, Snelgrove argued that a conflict of interest existed as to the public defender's office's representation of other inmates that were questioned by the State in connection with the Snelgrove investigation. This argument, however, was briefed in a conclusory fashion, at best, and, in any event, unlike Matthews, none of these inmates testified against Snelgrove at trial.
[13] Spencer v. State, 615 So.2d 688 (Fla. 1993).
[14] Although Brady is usually applied in the postconviction context, we have in the past applied it on direct appeal. See, e.g., Lugo v. State, 845 So.2d 74, 105-106 (Fla.2003) (noting that a posttrial Richardson inquiry was held on the allegation that the State failed to disclose that one of its testifying witnesses was the target of a federal investigation for Medicare fraud but analyzing the issue on direct appeal under Brady).
[15] We note that the same result would obtain if we were to analyze this issue under Richardson. In State v. Schopp, 653 So.2d 1016 (Fla.1995), we rejected a rule of per se reversal for failures to conduct Richardson hearings. We recognized that "there are cases... where a reviewing court can say beyond a reasonable doubt that the defense was not prejudiced by the underlying [discovery] violation and thus the failure to make [an] adequate [Richardson] inquiry was harmless error." Id. at 1020. We went on to hold that "[i]n determining whether a Richardson violation is harmless, the appellate court must consider whether there is a reasonable possibility that the discovery violation procedurally prejudiced the defense," that is, whether "there is a reasonable possibility that the defendant's trial preparation or strategy would have been materially different had the violation not occurred." Id. For the same reasons expressed above in denying the Brady claim, if Richardson applied, the trial court's failure to conduct a Richardson hearing was harmless error.
[16] Some of the comments were made during the penalty phase. In light of our holding that Snelgrove is entitled to a new penalty phase, we will not address the prosecuting attorney's penalty-phase comments.
[17] Snelgrove argues that he did object to this statement, but the transcript reveals that he actually objected later when the State argued that the knife broke when it was plunged "through the breast bone of a living human being in a struggle." The trial court overruled the objection, and Snelgrove has not pressed this point on appeal.
[18] The State argues that Snelgrove would not be entitled to relief under the harmless-error test because all of the aggravating and mitigating factors found by the jury and submitted to the judge applied equally to both murder counts.
[19] In Pangburn, the parties recognized the problem with the jury recommendation after it was rendered. Noting that it was impossible to determine whether the jury's seven-to-five death recommendation was for each murder or only one (and, if so, which one), the parties stipulated that the recommendation would be accepted as death for one of the murders and life for the other. 661 So.2d at 1185. The defendant later attempted to withdraw from this stipulation, but the trial court refused to allow it. Id.
[20] We also remind the trial court that its sentencing order should conform to the requirements of Campbell v. State, 571 So.2d 415 (Fla. 1990), and Fennie v. State, 855 So.2d 597 (Fla.2003).