# Supreme Court of Florida

_____

No. SC15-1659
_____

**DAVID BEASHER SNELGROVE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC16-124
_____

**DAVID BEASHER SNELGROVE,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[May 11, 2017]

PER CURIAM.

David Beasher Snelgrove appeals an order of the circuit court denying his

postconviction motion filed pursuant to Florida Rule of Criminal Procedure 3.851

and simultaneously petitions this Court for a writ of habeas corpus.[1] For the

reasons that follow, we affirm the denial of the postconviction motion and deny the

petition for writ of habeas corpus, but vacate the two death sentences and order that

Snelgrove receive a new penalty phase proceeding based on the United States

Supreme Court's decision in Hurst v. Florida, 136 S. Ct. 616 (2016), and this

Court's decision in Hurst v. State, 202 So. 3d 40 (Fla. 2016), petition for cert. filed,

No. 16-998 (U.S. Feb. 13, 2017).

## I. BACKGROUND

Following a jury trial in May 2002, Snelgrove was convicted and sentenced

to death for the June 2000 murders of Glyn and Vivian Fowler. In Snelgrove's

initial direct appeal, this Court described the case as follows:

> On Sunday, June 25, 2000, Glyn and Vivian Fowler were found
> dead in their home. The elderly couple had been brutally beaten and
> stabbed to death, as evidenced by multiple fractures and stab wounds
> spread throughout their bodies. Ultimately, Vivian died from a stab
> wound to the heart, and Glyn died of a brain injury caused by blunt
> force trauma to the head.
> Evidence at the crime scene and in the surrounding area linked
> David Snelgrove, the twenty-seven-year-old nephew of one of the
> Fowlers' neighbors, to the murder. Snelgrove had recently moved in
> with his aunt and his cousin, Jeff McCrae, after being expelled from a
> drug rehabilitation program. Blood droplets matching Snelgrove's
> DNA were found throughout the house, as were bloody fingerprints
> and footprints matching Snelgrove's. A trained bloodhound followed
> a scent from the blood on the Fowlers' broken window to Snelgrove,

---

1. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

and the police recovered a knife in the woods next to the Snelgrove home with blood matching Snelgrove's DNA.

. . . .

Defense counsel . . . offered a defense to the State's case. It admitted to the burglary, but denied the murders. Specifically, the defense claimed that Snelgrove did, indeed, enter the Fowlers' home through the broken window, but only after the Fowlers had been killed by someone else. In the process of coming through the window, Snelgrove cut his hand. . . .

The jury . . . found Snelgrove guilty of two counts of first-degree murder, one count of robbery with a deadly weapon, and one count of burglary of a dwelling with battery. On the two counts of first-degree murder, the jury found Snelgrove guilty of <u>both</u> premeditated and felony murder. In the penalty phase, the jury recommended the sentence of death by a vote of seven to five. However, this recommendation did not individually address the two capital murder convictions for which Snelgrove was to be sentenced. . . .

The circuit court sentenced Snelgrove to death on both capital murder convictions . . . .

<u>Snelgrove v. State</u>, 921 So. 2d 560, 562-65 (Fla. 2005) (footnote omitted).

On appeal, this Court affirmed Snelgrove's convictions but reversed his death sentences, holding that they were invalid because "the jury returned only a single, undifferentiated advisory sentence." <u>Id.</u> at 566. Accordingly, the case was remanded for a new penalty phase. <u>Id.</u>

The second penalty phase began in January 2008. On the first day of jury selection, Snelgrove moved for a continuance for additional time to "test for

- 3 -

mental retardation."[2]  Snelgrove v. State, 107 So. 3d 242, 247 (Fla. 2012).  This

Court explained the circumstances as follows:

> According to defense counsel, on the night before jury selection, Dr. Robert M. Berland, a forensic psychologist who examined Snelgrove and testified at the first penalty phase, notified defense counsel of his recommendation to again test Snelgrove to determine whether Snelgrove was mentally retarded.[FN2]  As Dr. Berland later explained, his recommendation was based on his understanding of the "Flynn Effect," which describes the tendency of revisions to the Weshler [sic] Adult Intelligence Scale (WAIS) test to produce lower scores for the same person than previous versions.  Dr. Berland testified that, because Snelgrove's previous score on the WAIS-R test was "borderline," the WAIS-III test might produce a score in the retarded range.  The trial court denied the motion to continue but allowed Snelgrove to proceed with the desired testing.
>
> > [FN2]  In preparation for his first trial, Snelgrove completed the revised Weshler [sic] Adult Intelligence Scale (WAIS-R) test and scored a 78, within the "borderline range of intellectual functioning" and above the retarded range.
>
> Following the second day of jury selection, Dr. Stephen Bloomfield, another forensic psychologist, conducted the requested WAIS-III test.  Snelgrove indicated that his IQ score on the WAIS-III test was 70, a score consistent with "mild mental retardation."  Therefore, on the third day of jury selection, defense counsel renewed the motion for continuance, arguing that the WAIS-III results merited additional testing and that the trial court should conduct a hearing to determine mental retardation pursuant to Florida Rule of Criminal Procedure 3.203.  The trial court denied the renewed motion after

---

2.  Because the terms "mental retardation" or "mentally retarded" and "intellectual disability" or "intellectually disabled" have the same meaning, they will be used interchangeably throughout this opinion.  See § 921.137(9), Fla. Stat. (2016).

- 4 -

noting its belief that a delay was unnecessary because a determination on retardation could be made any time prior to sentencing.

Id. at 247-48.

After Snelgrove's IQ was retested by Dr. Bloomfield, the parties presented the following evidence to the penalty phase jury:

> [T]he prosecution presented extensive evidence detailing the scene of the crime, injuries to the victims, and incriminating injuries to Snelgrove. The prosecution's evidence included expert testimony from forensic pathologist Dr. Thomas Beaver, who testified that both victims bore defensive wounds and had been severely beaten, strangled, and stabbed in the context of a prolonged struggle involving significant pain and suffering. Dr. Beaver further testified that, unlike Mrs. Fowler, who lived through all inflicted injuries, Mr. Fowler was alive only through the beating and strangling and died just prior to the stabbings. There was no sign of sexual assault.
>
> Snelgrove presented testimony from corrections officers, family members, and experts. Dr. Drew Edwards, an expert in cocaine addiction, testified that cocaine impairs one's judgment, decision-making, and behavioral control. Dr. Edwards also provided his opinion that Snelgrove was addicted to cocaine at the time of the murders, and he further expressed his opinion on cross-examination that Snelgrove would not have committed the crime if he was not intoxicated. Dr. Joseph Wu, an expert in PET scanning, testified that Snelgrove's temporal lobe and subcortical areas were asymmetrical, abnormalities "consistent with a history of possible trauma" and producing a "disproportionate response to an insult or provocation or threat." Dr. Wu also testified that cocaine can exacerbate abnormal functioning of the brain. Dr. Berland testified that Snelgrove exhibited signs of psychotic disturbance, specifically, depression and delusional paranoid thinking. Based on that result, Dr. Berland testified that Snelgrove was acting under an extreme mental or emotional disturbance and was substantially impaired in his capacity to conform his conduct to the requirements of the law (but not in his capacity to appreciate the criminality of his conduct).[FN3] Snelgrove presented his educational records to Dr. Berland, who was questioned regarding Snelgrove's placement in special education classes (ESE) as

a child.  And Dr. Bloomfield testified that he administered the WAIS-III test and that Snelgrove scored a 70, suggestive of mild mental retardation.  However, Dr. Bloomfield testified that further testing was necessary for a diagnosis of retardation.

> [FN3]  On cross-examination, Dr. Berland clarified that he did not seek any information from Snelgrove or law enforcement regarding the crime and did not have the information necessary to form a causal link between Snelgrove's psychosis and the crime.

> In rebuttal, the prosecution presented testimony from Dr. Lawrence Holder, a radiologist and nuclear medicine physician, who reviewed PET scan video and images prepared and analyzed by Dr. Wu.  Dr. Holder testified that he observed no abnormality in the PET scan and instead found that Snelgrove's brain operated normally.  The prosecution also played video of Snelgrove's statement to law enforcement and presented testimony from the officer who interrogated Snelgrove.  The interrogating officer testified that Snelgrove appeared sober and aware throughout their contact.

Id. at 248.  Based on this evidence, "[t]he jury recommended, by separate votes of 8-4 and 8-4, death sentences for each murder."  Id. at 249.

Following the penalty phase, Snelgrove was granted a 15-month continuance of the Spencer[3] hearing to conduct further testing to determine whether he was intellectually disabled.  Id.  After the testing was complete, Snelgrove filed a motion to prohibit the death penalty due to an alleged intellectual disability, which was taken up at the Spencer hearing in June 2009.  Id.  This Court summarized the evidence from that hearing as follows:

_____

3.  Spencer v. State, 615 So. 2d 688 (Fla. 1993).

At the Spencer hearing, Snelgrove presented evidence regarding possible mental retardation. His family members reiterated testimony given at the penalty phase that Snelgrove was twice hospitalized as a child, once when he fell out of a shopping cart and once when he overdosed on a relative's prescription medication. Family members offered their observations that Snelgrove was a hyperactive child and mentally "slow," and an older cousin recalled that Snelgrove grew depressed after his parents died. Snelgrove also presented testimony from Dr. Bloomfield, who added to his penalty-phase testimony by detailing his findings that Snelgrove had a significant deficit in adaptive functioning and that the adaptive deficit "likely" manifested prior to age 18. Dr. Bloomfield testified that he inferred both findings from the fact that, when Snelgrove was a child, he was classified by the public school system as "emotionally handicapped" (EMO) and, as a result of the classification, placed in exceptional student education (ESE) classes. Dr. Bloomfield could not locate any records to explain Snelgrove's ESE/EMO designation. However, he testified that such a designation—made before Snelgrove was 18—would have resulted from "some combination" of observable "maladaptive behavior" which serves to define an emotional handicap and could be roughly transferred to a determination that Snelgrove had deficient adaptive functioning. Dr. Bloomfield clarified that he could not provide a definitive answer as to intellectual functioning prior to age 18 because he could not find an IQ score on Snelgrove prior to age 18.

In response to Dr. Bloomfield's testimony, the prosecution presented expert testimony from Dr. Gregory Prichard, a forensic psychologist who evaluated Snelgrove for mental retardation and reviewed the same documentation used by Dr. Bloomfield. Dr. Prichard administered the Stanford-Binet 5 test and determined that Snelgrove's full-scale IQ was 75, above the retarded range. [Dr.] Prichard further testified that, while Snelgrove's ESE/EMO designation likely indicated behavioral problems beginning prior to age 18, it also meant that the school system had likely ruled out the possibility of intellectual problems first by testing Snelgrove's IQ and declining to classify him as mentally retarded. Placing a mentally retarded child in EMO classes, he said, would be illegal. Dr. Prichard did not see any evidence of intellectual limitations in his four-hour interview with Snelgrove or in Snelgrove's records.

Id.

After the Spencer hearing, but before sentencing, the trial court issued an

order denying Snelgrove's claim of intellectual disability.

> In its order, the trial court noted the conflict among Drs. Bloomfield
> (IQ of 70) and Prichard (IQ of 75) regarding Snelgrove's intellectual
> functioning. It further found that Snelgrove was not deficient in
> adaptive functioning, citing evidence that Snelgrove had no trouble
> communicating, maintaining relationships, keeping full-time
> employment, and caring for himself. Finally, the trial court
> determined that the record conclusively refuted manifestation of the
> condition prior to the age of 18 because Snelgrove's placement in
> ESE/EMO classes did not constitute evidence of mental retardation.

Id. at 249-50. Thereafter, the trial court followed the jury's recommendation and

imposed two death sentences for the murders of Glyn and Vivian Fowler.[4] Id. at

250.

---

4. The trial court found five aggravators applicable to each of the murders:

(1) the murder was committed when Snelgrove was on community
control for a felony offense of tampering with physical evidence (little
to some weight); (2) prior violent felony based on the
contemporaneous murder (great weight); (3) the murder was
committed during the commission of robbery and/or burglary, merged
with pecuniary gain (significant weight); (4) the murder was
especially heinous, atrocious, or cruel (HAC) (great weight); and (5)
the victim was particularly vulnerable due to advanced age
(significant weight).

Snelgrove, 107 So. 3d at 250. The trial court found one statutory mitigator—
extreme mental or emotional disturbance (significant weight)—and the following
nonstatutory mitigators:

(1) Snelgrove was a hard worker (some weight); (2) Snelgrove was a
loving and caring person who was loved by his family (some weight);
(3) Snelgrove had a long history of drug addiction (significant

In December 2009, Snelgrove appealed the result of his second penalty phase, raising seven issues.[5] As to the denial of his claim of intellectual disability, this Court held that the trial court's determination that Snelgrove was not intellectually disabled was supported by competent, substantial evidence:

> First, competent, substantial evidence supports the conclusion that Snelgrove failed to establish subaverage general intellectual functioning. We have found support for a finding against subaverage general intellectual functioning where the IQ scores did not definitively suggest mental retardation. See Phillips v. State, 984 So. 2d 503, 511 (Fla. 2008) ("[T]he majority of Phillips's IQ scores

weight); (4) Snelgrove was greatly impacted by the death of his parents (some weight); (5) Snelgrove is a model inmate and has adjusted well to a structured environment (little weight); (6) Snelgrove suffers from some abnormal brain functioning and has a somewhat limited level of intelligence (some weight).

Id.

5. Snelgrove raised the following issues on direct appeal:

(A) whether the trial court erred in denying Snelgrove's motion for continuance before the penalty phase to further explore the possibility that Snelgrove was retarded; (B) whether the trial court erred in finding that Snelgrove was not mentally retarded; (C) whether the trial court erred in admitting video of Snelgrove's statement to law enforcement; (D) whether the trial court erred in instructing the jury on its advisory role; (E) whether the trial court erred in allowing the prosecution to cross-examine mental health experts Dr. Berland and Dr. Edwards regarding their knowledge of the facts surrounding the murders; (F) whether the prosecution's comments and the trial court's instructions regarding victim impact evidence together constituted reversible error; and (G) whether the trial court erred in considering and weighing several aggravators and mitigators.

Id.

exceed that required under section 921.137. Moreover, the court questioned the validity of the only IQ score falling within the statutory range for mental retardation."); Jones v. State, 966 So. 2d 319, 329 (Fla. 2007) ("Jones's scores on the WAIS were as follows: 72 (1991), 70 (1993), 67 (1999), 72 (2003), and 75 (2005). In other words, the scores did not indicate 'significantly subaverage general intellectual functioning.'"). Snelgrove scored a 78 on the WAIS-R, a 70 on the WAIS-III, and a 75 on the Stanford-Binet 5. The trial court found the last score of 75 to be more credible than the score of 70, given Snelgrove's childhood placement in "emotionally handicapped" classes instead of "educable mentally handicapped" or "trainable mentally handicapped" classes. See Burns v. State, 944 So. 2d 234, 247 (Fla. 2006) (finding competent, substantial evidence in spite of one IQ score of 69 because the more credible expert scored Burns' IQ at 74).

Second, competent, substantial evidence supports the conclusion that Snelgrove failed to demonstrate deficits in adaptive behavior. Section 921.137(1), Florida Statutes, defines "adaptive behavior" as "the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." Along these lines, the prosecution's expert testified that Snelgrove was able to use abstractions in communication and had no trouble communicating or comprehending questions. Snelgrove's family testified that he maintained significant family relationships, especially with his mother, and had no trouble maintaining employment in businesses inside and outside of family ownership. Snelgrove had a driver's license, drove company vehicles, and babysat for the family. Additionally, while in prison, Snelgrove lodged several complaints, sought services for basic needs, and requested items that included a dictionary, pinochle cards, and prior medical reports. In short, there was evidence to support the finding that Snelgrove met "the standards of personal independence and social responsibility."

Finally, there was competent, substantial evidence to support the trial court's finding regarding the age of manifestation. Though the school records indicated academic problems beginning prior to age 18, Snelgrove offered no evidence to explain them or his placement in ESE/EMO classes. In the absence of records, Snelgrove and the prosecution offered conflicting expert testimony regarding why a child may receive such a designation.[FN8] Yet Snelgrove's

- 10 -

expert limited his discussion to the manifestation of deficient adaptive behavior and admitted that he could not provide a definitive answer as to intellectual functioning prior to age 18. Based on the lack of information to support the claim, Snelgrove could not satisfy the third prong of the mental retardation statute. See Phillips, 984 So. 2d at 512 ("As the trial court found, 'there was no evidence [t]o support the Defendant's contention that his poor grades were a result of mental retardation.'"); Cherry[v. State, 959 So. 2d 702, 711 (Fla. 2007)] (clarifying the statutory requirement by explaining that the defendant must establish that both "subaverage general intellectual functioning and deficits in adaptive behavior manifested before the age of eighteen").

> [FN8] In its order rejecting the mental retardation claim, the trial court found the expert for the prosecution to offer the more credible explanation—that Snelgrove was likely tested and determined not to be retarded because it would have been illegal to place a retarded child in EMO classes.

Id. at 252-54 (some citations omitted). This Court also rejected the other six issues raised by Snelgrove and affirmed the trial court's imposition of the two death sentences. Id. at 262.

In September 2014, Snelgrove filed a postconviction motion pursuant to rule 3.851.[6] After summarily denying several claims and holding an evidentiary

---

6. The postconviction claims were: (1) trial counsel was ineffective during the penalty phase for failing to call Christine Mack as a mitigation witness and to testify regarding the claim of intellectual disability; (2) trial counsel was ineffective during the penalty phase for failing to object to improper prosecutorial comments; (3) the cumulative effect of trial counsel's errors deprived Snelgrove of a fair trial; (4) trial counsel was ineffective during the guilt phase for failing to request a colloquy regarding Snelgrove's right to testify; (5) section 921.141, Florida Statutes (2000), violates the Eighth Amendment because it is vague and overbroad; (6) Snelgrove's Eighth Amendment rights will be violated if he is

hearing on Snelgrove's claims of ineffective assistance of trial counsel during the penalty phase, the postconviction court denied relief.  Snelgrove now appeals the denial of his postconviction motion.  He also petitions this Court for a writ of habeas corpus.[7]

## II. INTELLECTUAL DISABILITY

Snelgrove claims that his trial counsel was ineffective during the second penalty phase for failing to secure Christine Mack, his high school's special education program administrator, as a witness to establish that he has an intellectual disability that manifested before the age of 18 and to provide mitigating evidence of his diminished intellectual functioning.  Because Snelgrove

---

incompetent at the time of execution; and (7) Florida's capital sentencing statute is unconstitutional on its face for failing to prevent the arbitrary and capricious imposition of the death penalty and for violating the guarantee against cruel and unusual punishment, and trial counsel was ineffective for failing to litigate these issues.

7.  The habeas claims are:  (1) appellate counsel was ineffective for not raising on direct appeal a claim of fundamental error regarding the unavailability of Snelgrove's school records; (2) appellate counsel was ineffective for not raising on direct appeal a claim of cumulative error; and (3) appellate counsel was ineffective for failing to raise on direct appeal several constitutional challenges to section 921.141, Florida Statutes, and Snelgrove's death sentences, including whether the sentences are unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002).

did not prove his trial counsel performed deficiently, thereby causing him

prejudice, we affirm the postconviction court's denial of this claim.[8]

Following the United States Supreme Court's decision in <u>Strickland v.</u>

<u>Washington</u>, 466 U.S. 668 (1984), this Court explained that two requirements must

be met for claims of ineffective assistance of counsel to succeed:

> First, the claimant must identify particular acts or omissions of the
> lawyer that are shown to be outside the broad range of reasonably
> competent performance under prevailing professional standards.
> Second, the clear, substantial deficiency shown must further be
> demonstrated to have so affected the fairness and reliability of the
> proceeding that confidence in the outcome is undermined.

<u>Bolin v. State</u>, 41 So. 3d 151, 155 (Fla. 2010) (quoting <u>Maxwell v. Wainwright</u>,

490 So. 2d 927, 932 (Fla. 1986)).

Regarding the deficiency requirement, "[t]here is a strong presumption that

trial counsel's performance was not ineffective." <u>Id.</u> (citing <u>Strickland</u>, 466 U.S. at

690). "A fair assessment of attorney performance requires that every effort be

made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689. Regarding the

prejudice requirement, the defendant must show that "there is a reasonable

---

8. We also affirm the denial of the other claims raised in Snelgrove's
motion because he failed to demonstrate that he was entitled to postconviction
relief.

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Williams v. Taylor, 529 U.S. 362, 391 (2000) (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.' " Henry v. State, 948 So. 2d 609, 617 (Fla. 2006) (quoting Strickland, 466 U.S. at 694).

Because both prongs of Strickland present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the postconviction court's factual findings that are supported by competent substantial evidence, but reviewing legal conclusions de novo. See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

In Atkins v. Virginia, 536 U.S. 304, 321 (2002), the United States Supreme Court ruled that the execution of a "mentally retarded" defendant constitutes cruel and unusual punishment and is therefore prohibited by the Eighth Amendment. Under Florida law, claims of intellectual disability as a bar to the imposition of the death penalty are governed by a three-prong test. Salazar v. State, 188 So. 3d 799, 811 (Fla. 2016). To establish such a claim, a defendant must demonstrate the following: "(1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen." Id.; see also § 921.137(1), Fla. Stat. (defining "intellectually disabled" or "intellectual disability" to include these three factors). The defendant

has the burden to prove by clear and convincing evidence that he is intellectually disabled. Salazar, 188 So. 3d at 811-12. "If the defendant fails to prove any one of these components, the defendant will not be found to be intellectually disabled." Id. at 812.

Snelgrove did not demonstrate that his trial counsel's performance in preparing for the second penalty phase was deficient. It is undisputed that under prevailing professional norms trial counsel has an "obligation to conduct a thorough investigation of [a] defendant's background." Porter v. McCollum, 558 U.S. 30, 39 (2009) (quoting Williams, 529 U.S. at 396). Here, the postconviction court's conclusion that Snelgrove's trial counsel conducted a sufficient investigation is supported by the record.

The record reflects that trial counsel conducted a thorough investigation into Snelgrove's background after Snelgrove scored a 70 on the WAIS-III test administered by Dr. Bloomfield during jury selection for the second penalty phase. At the evidentiary hearing, trial counsel testified that after being granted a year-long continuance for the Spencer hearing he met with Snelgrove to discuss a claim of intellectual disability. Snelgrove gave trial counsel the names of two people who Snelgrove said knew him as a child, but trial counsel was unable to locate them to serve as witnesses. In addition, trial counsel and his team contacted the Miami-Dade County school district about obtaining test scores and additional

records for Snelgrove, but no such records were available. As Snelgrove's own witness testified at the evidentiary hearing, some of his school records had been destroyed pursuant to state guidelines more than a year before he committed the murders in this case. Trial counsel cannot be faulted for not discovering records that no longer existed at the time of his investigation. Cf. Rivera v. State, 995 So. 2d 191, 205 (Fla. 2008) (holding that trial counsel was not deficient for not discovering evidence that did not exist until after trial).

Trial counsel's failure to locate Christine Mack and present her as a witness was not deficient in light of counsel's reasonable investigation and the evidence presented during the penalty phase. At the jury proceeding, trial counsel called multiple members of Snelgrove's family as mitigation witnesses to testify about his background, as well as four expert witnesses to discuss his psychological and intellectual functioning. Trial counsel also entered into evidence Snelgrove's high school transcripts, which reflected his ESE designation and failing grades. As to the Spencer hearing, trial counsel testified that without the benefit of a childhood IQ score or a nonfamily lay witness, he chose to rely on the same testimony from Snelgrove's family and the expert witnesses to establish that Snelgrove had an intellectual disability that manifested before the age of 18. Snelgrove failed to demonstrate that this presentation of the evidence during the second penalty phase

was not a sound strategic decision by his trial counsel.  See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000).

Snelgrove also failed to demonstrate how trial counsel's alleged deficient performance caused him prejudice.  As to Snelgrove's claim that Ms. Mack's testimony would have established the third prong of the test for an intellectual disability, at best, her testimony would have been cumulative of other evidence presented at the Spencer hearing and thus would have made little, if any, difference in the outcome.  See Wong v. Belmontes, 558 U.S. 15, 22 (2009) (holding that a defendant cannot establish the prejudice prong of Strickland with evidence that is "merely cumulative" of evidence already presented).  For example, like Dr. Bloomfield, at the evidentiary hearing Ms. Mack pointed to Snelgrove's designation as emotionally handicapped and his placement in ESE classes as evidence that he may have had subaverage intellectual functioning prior to the age of 18.  Although Ms. Mack testified that it was possible for a student to score 70 or below on an IQ test yet still be placed in ESE/EMO classes, like Dr. Bloomfield, she could not definitively state that this is what happened to Snelgrove.  Instead, Ms. Mack was clear in her testimony that to her knowledge Snelgrove had never been deemed to be intellectually disabled and she did not know what his IQ score was at the time he was a student.  Because Ms. Mack's testimony added nothing new to the question of whether Snelgrove had an intellectual disability that

- 17 -

manifested prior to the age of 18, Snelgrove failed to prove that there is a reasonable probability the trial court would have ruled differently on his claim of intellectual disability had Ms. Mack been called as a witness.

Similarly, Ms. Mack's testimony would have been cumulative of other mitigating evidence presented to the jury during the second penalty phase. Snelgrove's claim that Ms. Mack would have provided "non-relative" testimony about his "problems with learning" overlooks the fact that his high school transcripts were entered into evidence, that Dr. Berland testified about Snelgrove's placement in ESE classes, and that Dr. Bloomfield testified that Snelgrove's 2008 IQ score of 70 was suggestive of "mild mental retardation." Ms. Mack's testimony about Snelgrove's EMO/ESE designation would not have added anything new to the evidence that was presented to the jury. Thus, Snelgrove failed to prove that there is a reasonable probability the jury's recommendations of death would have been different had Ms. Mack been called as a mitigation witness. In other words, our confidence in the outcome of the penalty phase is not undermined. See Brant v. State, 197 So. 3d 1051, 1073-74 (Fla. 2016) ("There is no reasonable probability that re-presenting virtually the same evidence through other [mitigation] witnesses would have altered the outcome in any manner." (quoting Atwater v. State, 788 So. 2d 223, 234 (Fla. 2001))).

Lastly, Snelgrove is not entitled to postconviction relief pursuant to the United States Supreme Court's decision in Hall v. Florida, 134 S. Ct. 1986 (2014). In Hall, the Supreme Court held that the definition of significantly subaverage general intellectual functioning establishing a strict IQ score cutoff of 70 "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." Id. at 1990. Accordingly, the Supreme Court held that the five-point standard error of measurement must be taken into account when assessing the subaverage intellectual functioning prong of the test for an intellectual disability. Id. at 2001. "[W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. This Court has recently determined that Hall should be applied retroactively. Walls v. State, 41 Fla. L. Weekly S466, S469 (Fla. Oct. 20, 2016).

Here, during the second penalty phase, Snelgrove was permitted to present evidence of all three prongs of the test for an intellectual disability. The trial court considered each prong in tandem in determining that Snelgrove was not intellectually disabled; no single factor was considered dispositive. See id. at S468 ("The Hall decision requires courts to consider all prongs of the test in tandem."). This Court previously reviewed the trial court's determination and concluded that

- 19 -

all of its findings were supported by competent, substantial evidence.  Snelgrove,

107 So. 3d at 252-53 (affirming trial court's conclusion that Snelgrove is not

intellectually disabled).  Snelgrove did not present any additional argument or

evidence on his claim of intellectual disability at the evidentiary hearing on his

postconviction motion.

Accordingly, Snelgrove is not entitled to postconviction relief regarding his

claim of intellectual disability.

### III. HURST

While Snelgrove's appeal from the denial of his postconviction motion was

pending, the United States Supreme Court issued its decision in Hurst v. Florida, in

which it held that Florida's capital sentencing scheme violated the Sixth

Amendment.  The Supreme Court concluded that "[t]he Sixth Amendment requires

a jury, not a judge, to find each fact necessary to impose a sentence of death.  A

jury's mere recommendation is not enough."  Hurst v. Florida, 136 S. Ct. at 619.

On remand from the Supreme Court, we held that "in addition to unanimously

finding the existence of any aggravating factor, the jury must also unanimously

find that the aggravating factors are sufficient for the imposition of death and

unanimously find that the aggravating factors outweigh the mitigation before a

sentence of death may be considered by the judge."  Hurst v. State, 202 So. 3d at

54.  We further held that a unanimous jury recommendation is required before a

trial court may impose a sentence of death.  Id.  Finally, we determined that a Hurst error is capable of harmless error review.  Id. at 67.

In Mosley v. State, 209 So. 3d 1248, 1283 (Fla. 2016), we held that Hurst v. Florida and Hurst v. State apply retroactively to those postconviction defendants whose sentences became final after the United States Supreme Court's 2002 decision in Ring v. Arizona, 536 U.S. 584 (2002).  There is no dispute that Snelgrove's death sentence became final during this timeframe.  Therefore, Snelgrove falls into the category of defendants to whom Hurst is applicable.  In light of the two nonunanimous jury recommendations to impose death in this case, it cannot be said that the failure to require a unanimous recommendation was harmless beyond a reasonable doubt.  See Kopsho v. State, 209 So. 3d 568, 569-70 (Fla. 2017).  We therefore vacate Snelgrove's death sentences and remand for a new penalty phase.

## IV. CONCLUSION

For the reasons stated above, we affirm the denial of Snelgrove's rule 3.851 motion and deny the petition for writ of habeas corpus, but we vacate his death sentences and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and LEWIS, and QUINCE, JJ., concur.
PARIENTE, J., concurs in part and dissents in part with an opinion.
POLSTON, J., concurs in part and dissents in part with an opinion, in which
CANADY and LAWSON, JJ., concur.

- 21 -

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring in part and dissenting in part.

I concur that Snelgrove is entitled to relief pursuant to Hurst. Majority op. at 20-21. I dissent, however, as to the majority's conclusion that "Snelgrove is not entitled to postconviction relief regarding his claim of intellectual disability." Majority op. at 20. Instead, I would remand for a new evidentiary hearing on Snelgrove's possible intellectual disability in light of the fact that the first evidentiary hearing on that matter occurred in 2009, prior to the United States Supreme Court's decision in Hall v. Florida, 134 S. Ct. 1986 (2014). As I previously explained, "Hall changed the manner in which evidence of intellectual disability must be considered." Walls v. State, 41 Fla. L. Weekly S466, S469, 2016 WL 6137287, at *7 (Fla. Oct. 20, 2016) (Pariente, J., concurring). Courts must now "consider all three prongs in determining an intellectual disability, as opposed to relying on just one factor as dispositive. . . . [B]ecause these factors are interdependent, if one of the prongs is relatively less strong, a finding of intellectual disability may still be warranted based on the strength of the other prongs." Oats v. State, 181 So. 3d 457, 467-68 (Fla. 2015).

When this Court last affirmed the trial court's denial of Snelgrove's intellectual disability claim, the Court cited Cherry v. State, 959 So. 2d 702 (Fla. 2007), and the trial court relied on Nixon v. State, 2 So. 3d 137, 142 (Fla. 2009),

- 22 -

which affirmed the bright-line cutoff IQ score of 70 for determining intellectual disability as stated in Cherry. See Snelgrove v. State, 107 So. 3d 242, 252 (Fla. 2012). Hall has since "specifically disapproved of the bright-line cutoff of 70 for IQ scores stated by this Court in Cherry," in assessing the first prong of the test for intellectual disability. Thompson v. State, 208 So. 3d 49, 50 (Fla. 2016). Thus, while the trial court had evidence from Snelgrove's and the State's experts that Snelgrove's full scale IQ scores ranged from 70 to 75, "it is impossible to know the true effect of this Court's holding in Cherry on the circuit court's review of the evidence presented at [Snelgrove's] intellectual disability hearing." Id. at 60.

Further, the majority apparently bases its conclusion that Snelgrove's pre-Hall intellectual disability hearing complied with the commands of Hall because the trial court permitted Snelgrove "to present evidence of all three prongs of the test for an intellectual disability." Majority op. at 19. Yet, as this Court explained in Thompson, "it is not enough that a defendant be allowed to present evidence on all three prongs of the intellectual disability test." 208 So. 3d at 59. The inquiry must instead focus on whether the court conducted a "conjunctive and interrelated assessment" of all prongs. Id. (quoting Hall, 134 S. Ct. at 2001).

I acknowledge that a defendant is not always entitled to another hearing on intellectual disability following Hall. However, in this case, there is a risk that the trial court and this Court were unduly influenced by an IQ score exceeding the

prior bright-line cut off score of 70, requiring a new evidentiary hearing or at the very least a reevaluation of the evidence previously presented.  Indeed, a review of the trial court's order rejecting Snelgrove's intellectual disability claim reveals that the trial court prefaced its analysis by emphasizing that this Court "has consistently interpreted" the statutory definition of significantly subaverage general intellectual functioning "to require a defendant seeking exemption from execution to establish he has an IQ of 70 or below."  State v. Snelgrove, No.: 00-323-CFFA (Fla. 7th Cir. July 2, 2009) (quoting Nixon, 2 So. 3d at 142) (denying Defendant's Motion to Prohibit the Imposition of the Sentence of Death/Mental Retardation).

In fact, the trial court's order denying Snelgrove's intellectual disability claim reveals that the court relied on the State's expert, Dr. Prichard, who testified that the defendant had a "full scale IQ of 75 and therefore was not mentally retarded."  As we explained in Walls, 41 Fla. L. Weekly at S469, 2016 WL 6137287 at *6, "[b]ecause [the defendant's] prior evidentiary hearing was directed toward satisfying the former definition of intellectual disability and was reviewed by the circuit court with the former IQ score cutoff rule in mind," remanding for a new evidentiary hearing on intellectual disability was necessary.  It is also necessary here.  Accordingly, I would conclude that a new intellectual disability hearing should be held prior to the commencement of the penalty phase to ensure

that Snelgrove "receive[s] the type of conjunctive and interrelated assessment that Hall requires." Thompson, 208 So. 3d at 59.

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentences pursuant to Hurst.

CANADY and LAWSON, JJ., concur.

An Appeal from the Circuit Court in and for Flagler County,
    Joseph David Walsh, Judge - Case No. 182000CF000323XXXXXX
And an Original Proceeding – Habeas Corpus

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel, and Richard E. Kiley and Ali Andrew Shakoor, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Scott A. Browne, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee/Respondent