# Supreme Court of Florida

_____

No. SC19-1858
_____

**JERRY LEON HALIBURTON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

June 17, 2021

PER CURIAM.

Jerry Leon Haliburton, a prisoner under sentence of death, appeals the trial court's order denying his motion for a determination of intellectual disability as a bar to execution, which was filed under Florida Rule of Criminal Procedure 3.203 and section 921.137, Florida Statutes (2019), and his amended successive motion for postconviction relief, which was filed under Florida Rule of Criminal Procedure 3.851.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.  For the reasons we explain, we affirm the denials of relief.

# I. BACKGROUND

Haliburton was convicted of the 1981 first-degree murder of Donald Bohannon and is under sentence of death. We affirmed Haliburton's conviction and death sentence on direct appeal. *Haliburton v. State*, 561 So. 2d 248, 249-50 (Fla. 1990). We also affirmed the denial of his initial motion for postconviction relief and denied his petition for a writ of habeas corpus, *Haliburton v. Singletary*, 691 So. 2d 466 (Fla. 1997), and affirmed the denial of his first successive motion for postconviction relief, *Haliburton v. State*, 935 So. 2d 1219 (Fla. 2006) (table).

In the wake of *Atkins v. Virginia*, 536 U.S. 304 (2002), Haliburton filed a second successive motion for postconviction relief, under Florida Rules of Criminal Procedure 3.851 and 3.203, seeking to vacate his death sentence on the ground that he was intellectually disabled. We affirmed the summary denial of that motion because Haliburton failed to demonstrate that his IQ was 70 or below and thus failed to establish that he is intellectually disabled under our interpretation of the law at that time. *Haliburton v. State*, 123 So. 3d 1146 (Fla. 2013), *vacated*, 574 U.S. 801 (2014), *order vacated on reconsideration*, 163 So. 3d 509 (Fla.

2015). Upon this Court's affirmance of the denial of his intellectual disability claim in 2013, Haliburton petitioned the United States Supreme Court for a writ of certiorari. Shortly thereafter, the Supreme Court issued its decision in *Hall v. Florida*, 572 U.S. 701, 704 (2014), holding that Florida's "rigid rule" interpreting section 921.137(1), Florida Statutes,[1] as establishing a strict IQ test score cutoff of 70 or less in order to present additional evidence of intellectual disability "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." The Supreme Court granted Haliburton's petition for certiorari and remanded to this Court for further consideration in light of *Hall*. *Haliburton*, 574 U.S. 801. On remand from the Supreme Court, this Court vacated its prior decision and remanded this case to the trial court for an evidentiary hearing on Haliburton's intellectual disability claim. *Haliburton*, 163 So. 3d 509.

---

1. Section 921.137 prohibits the imposition of the death penalty upon the intellectually disabled and defines intellectual disability as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18."

Three witnesses testified at the evidentiary hearing; two were called by Haliburton—one of his brothers, John H. Haliburton, and Dr. Bruce Frumkin, a forensic and clinical psychologist—and one was called by the State—Dr. Michael Brannon, a forensic psychologist. John H.[2] testified that when they were young, Haliburton had trouble understanding things and doing chores, and although Haliburton completed the ninth grade, he needed help with his schoolwork. When Haliburton got older, John H. never knew him to live alone, drive a car, pay bills, or have a bank account.

Dr. Frumkin first evaluated Haliburton in 1992. At that time, he administered Haliburton the Wechsler Intelligence Scale-Revised (WAIS-R) IQ test, on which Haliburton obtained a full-scale IQ score of 80. Dr. Frumkin became involved in the case again in 2010 when he was asked to evaluate Haliburton for intellectual disability. In 2010, Dr. Frumkin administered Haliburton the WAIS-IV, on which Haliburton obtained a full-scale IQ score of 74. According to

---

2. Haliburton also has a brother named John R. Haliburton, who previously testified in this case but is now deceased. Each brother will be referred to by his first name and middle initial.

Dr. Frumkin, based on the score of 74 and its 95 percent confidence interval, there is a 95 percent chance that Haliburton's actual IQ is between 70 and 79.[3]  Dr. Frumkin testified that the 70-79 range is consistent with all of the valid IQ test scores that Haliburton has ever achieved, which, in addition to the 80 and 74 obtained by Dr. Frumkin, include a second 80 (obtained by Dr. Fleming using the WAIS-R in 1992), a 79 (obtained by Dr. Eisenstein using the WAIS-III in 2000), and another 74 (obtained by Dr. Crown using the WAIS-IV in 2009).[4]  Dr. Frumkin now questions the 80 that Haliburton obtained on the WAIS-R in 1992. He now believes that score was overestimated by approximately four points, due to the Flynn effect.[5]

---

3.  Dr. Frumkin explained that the standard error of measurement (SEM) is not always five points on each side of the score obtained; rather it depends on the test.  For the WAIS-IV, the SEM is four points down and five points up, according to Dr. Frumkin.

4.  Haliburton also references a score of 75 on another WAIS-R administered by Dr. LaFehr Hession in 1988, but the trial court did not rely on this score for reasons unknown, and Haliburton does not allege that the trial court erred in failing to consider this score. Thus, we do not consider it here.

5.  "The Flynn effect refers to a theory in which the intelligence of a population increases over time, thereby potentially inflating

Dr. Frumkin testified that, in his opinion, Haliburton does have "significantly subaverage intelligence," based upon the fact that "he came across as someone with intellectual deficiencies," "[h]e was a very poor historian," and based on the score of 74 on the WAIS-IV in 2010. Additionally, Dr. Frumkin observed during his evaluation that Haliburton had very poor vocabulary, was very concrete in his thinking, had to have questions asked simply and repeated, was "off on timeframes," and that his reading, spelling, and arithmetic abilities varied from the fourth to fourteenth percentiles.

To assess Haliburton's adaptive functioning, Dr. Frumkin administered the Adaptive Behavior Assessment System-II (ABAS-II) to Haliburton's sister, Helen, and his brothers, John R. and John H. Dr. Frumkin determined the raw numbers produced by those assessments to be invalid for Helen and John H. but noted that there was general agreement among the siblings in terms of Haliburton's strongest and weakest areas.

---

performance on IQ examinations. The accepted increase in scoring is approximately three points per decade or 0.33 points per year." *Quince v. State*, 241 So. 3d 58, 60 n.2 (Fla. 2018).

Dr. Frumkin opined that Haliburton has two or more deficits in adaptive functioning and thus meets the adaptive deficits prong of the intellectual disability standard. Dr. Frumkin found that Haliburton had deficits in the conceptual domain based on his poor math skills, but he was vague in his testimony regarding in which other domain Haliburton had substantial deficits. In his report, Dr. Frumkin wrote, "He would have had at least major deficits in functional academic skills, using community resources, self-direction, and in communication."

Dr. Frumkin also testified that onset of Haliburton's condition occurred before the age of eighteen. This was based upon school records indicating that Haliburton had intellectual problems and difficulty functioning in school, was in special education classes, and a notation in the records that he "needs help in all salient areas." Based on his findings regarding Haliburton's subaverage intelligence, adaptive deficits, and the timeframe during which those problems manifested, Dr. Frumkin concluded that Haliburton is intellectually disabled.

Dr. Brannon evaluated Haliburton in June 2018. Prior to the evaluation, Dr. Brannon reviewed school records, prison records,

and the scores on the WAIS tests previously administered to Haliburton. During the evaluation, Haliburton said that he completed the ninth grade in special education classes but had problems in school with hyperactivity, attentiveness, and following rules. He admitted to always being in some kind of trouble at school and bullying his peers. Haliburton discussed being sentenced to a "reform school" as a juvenile and serving three stints in prison as an adult, prior to the murder. He also had multiple arrests for driving offenses. Haliburton said he had never been married but reported being involved in a seventeen or eighteen-year relationship and living with his girlfriend at the time of his arrest for the murder. Haliburton reported using alcohol and a wide variety of drugs—heroin, amphetamines, barbiturates, cocaine, and marijuana—on a daily basis, beginning around age fourteen or fifteen. He provided Dr. Brannon with an accurate medical history and a rather elaborate personal history, which was not contradicted by any of the records. He reported being able to prepare basic meals but said that the women in his life had done most of the cooking and laundry for him. Haliburton reported reading every day in prison. He reads from the Koran, westerns, political books,

black history, and books about the history of the United States and of Islam. He mentioned reading *Liberty Defined* by Ron Paul, [A] *People's History of the United States* by Howard Zinn, and *But They Didn't Read Me My Rights!* by Michael Cicchini, and he was able to convey to Dr. Brannon an understanding of what he had read in those books. He said he watches world news, C-SPAN, political shows, and follows the progress of bills.

Dr. Brannon observed that Haliburton's vocabulary was rich with words that would be expected from someone who was well within their upper high school years, which, Dr. Brannon said, is more consistent with the 79-80 IQ scores Haliburton achieved than the scores of 74. Haliburton could discuss concepts like "rights," "liberty," and "justice," and understand them in an abstract fashion. He had made multiple clear and grammatically correct written requests to prison authorities about the living conditions and his medical and dental needs, which Dr. Brannon reviewed.

Regrading Haliburton's IQ, Dr. Brannon acknowledged the Flynn effect and the practice effect[6] but said there is no way of

---

6. This Court has explained that "[t]he practice effect causes an individual's IQ scores to rise if that individual was administered

applying those theories in any sort of reasonable scientific way to Haliburton. Dr. Brannon concluded that Haliburton had neither significantly subaverage general intellectual functioning nor significant deficits in his adaptive functioning. In Dr. Brannon's opinion, Haliburton did not meet the criteria for intellectual disability.

Following the evidentiary hearing, Haliburton filed, with leave of court, a supplement to his then-pending *Hurst*-related amended 3.851 motion. In those filings, Haliburton contended that his death sentence, which was imposed following a nonunanimous jury recommendation of death, violated the Fifth, Sixth, Eighth, and Fourteenth Amendments, as described in both *Hurst v. Florida*, 577 U.S. 92 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020), *cert. denied*, 141 S. Ct. 1051 (2021). The trial court ultimately issued an order on September 27, 2019, denying Haliburton's intellectual disability and *Hurst* claims. This appeal follows.

---

the same IQ test within one year." *Thompson v. State*, 208 So. 3d 49, 56 n.9 (Fla. 2016).

## II. ANALYSIS

Haliburton raises three issues on appeal. He asserts that the trial court erred in failing to find that he is intellectually disabled; that section 921.137(4), Florida Statutes, which requires a defendant to prove his intellectual disability by clear and convincing evidence, is unconstitutional; and that his death sentence imposed following a nonunanimous jury recommendation of death violates the Fifth, Sixth, Eighth, and Fourteenth Amendments. We address each claim in turn.

### A. Intellectual Disability

In 2002, the United States Supreme Court held in *Atkins*, 536 U.S. at 321, that the Eighth and Fourteenth Amendments to the United States Constitution forbid the execution of persons with intellectual disability. The Court observed that "clinical definitions of [intellectual disability] require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." 536 U.S. at 318. Similarly, under Florida law, " 'intellectual disability' means significantly subaverage general intellectual functioning existing concurrently with deficits in

- 11 -

adaptive behavior and manifested during the period from conception to age 18." § 921.137(1), Fla. Stat. (2019). "Significantly subaverage general intellectual functioning" is defined as "performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Agency for Persons with Disabilities."[7] *Id.* "Adaptive behavior" "means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." *Id.* Thus, to establish intellectual disability as a bar to execution, a defendant must demonstrate (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen.

Until 2014, section 921.137(1) was interpreted as requiring that a defendant have an IQ of 70 or below in order to meet the first prong of the intellectual disability standard—significantly

---

7. The tests approved by the rules of the Agency for Persons with Disabilities are the Stanford-Binet Intelligence Scale and the Wechsler Intelligence Scale. Fla. Admin. Code R. 65G-4.011.

subaverage general intellectual functioning—and failure to present an IQ score of 70 or below precluded a finding of intellectual disability. *Cherry v. State,* 959 So. 2d 702, 712-13 (Fla. 2007), *abrogated by Hall,* 572 U.S. 701. In *Hall,* the Supreme Court held that Florida's "rigid rule" interpreting section 921.137(1) as establishing a strict IQ test score cutoff of 70 or less in order to present additional evidence of intellectual disability "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." 572 U.S. at 704. The Court further held that when assessing the intellectual functioning prong of the intellectual disability standard, courts must take into account the standard error of measurement (SEM) of IQ tests. *Id.* at 723. And "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error [±5], the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* If the defendant fails to prove any one of the three components of the statutory test for intellectual disability, the defendant will not be found to be intellectually disabled. *See Salazar v. State,* 188 So. 3d

799, 812 (Fla. 2016); *accord Williams v. State*, 226 So. 3d 758, 773 (Fla. 2017); *Snelgrove v. State*, 217 So. 3d 992, 1002 (Fla. 2017).

"In reviewing determinations of [intellectual disability], this Court examines the record for whether competent, substantial evidence supports the determination of the trial court." *State v. Herring*, 76 So. 3d 891, 895 (Fla. 2011). "This Court 'does not reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses.' " *Id.* (quoting *Brown v. State*, 959 So. 2d 146, 149 (Fla. 2007)).

## 1. Significantly Subaverage General Intellectual Functioning

The relevant IQ scores presented by Haliburton at the evidentiary hearing ranged from 74 to 80. His most recent testing using the WAIS-IV in 2010 has a confidence interval of 70-79, "meaning there's a 95 percent chance that his IQ score is between 70 and 79," according to Dr. Frumkin. Applying the SEM to Haliburton's highest IQ score reveals that his true IQ could be as high as 85. Dr. Brannon testified regarding the reasons why the other evidence in this case points to Haliburton's true IQ being in the 79-80 range, rather than on the low end of 70. Dr. Brannon based his assessment on his evaluation of Haliburton, his review of

Dr. Frumkin's 2010 report, Haliburton's prison records, and Haliburton's earlier IQ scores of 80—achieved twice—on the WAIS-R and 79 on the WAIS-III.

The trial court found "Dr. Brannon's testimony here both credible and persuasive." The trial court declined to apply the Flynn effect to Haliburton's scores of 80, stating that "while the Flynn effect is something to consider, both Dr. Frumkin and Dr. Brannon agreed it would be against standard practice to adjust an individual's score by a certain number of points to account for the Flynn effect."

We conclude that the trial court's finding that Haliburton failed to establish that he has significantly subaverage general intellectual functioning is supported by competent, substantial evidence in the record. Dr. Brannon thoroughly explained why the totality of the evidence in this case supports the conclusion that Haliburton's true IQ is in the 79-80 range—which does not satisfy this prong—including his scores on the Test of Adult Basic Education, which were consistent with an IQ of 79-80, his vocabulary, his reading and television interests, his ability to think abstractly, his ability to give an accurate, detailed account of his

personal history, and Dr. Brannon's testimony that "you can't fake good," "meaning a person's higher IQ scores will more accurately reflect a person's capacity, while lower IQ scores achieved on other test administrations might be attributable to a variety of potential factors." The trial court found Dr. Brannon to be more credible than Dr. Frumkin, and we will not now disturb that finding.

The trial court's decision not to apply the Flynn effect to Haliburton's scores of 80, and view them as scores of 76, is also supported by the evidence. The trial court noted that "both Dr. Frumkin and Dr. Brannon agreed it would be against standard practice to adjust an individual's score by a certain number of points to account for the Flynn effect." Indeed, Dr. Frumkin testified that "the Flynn effect has to do with populations, it doesn't have to do with individuals so you can't say a specific individual is automatically X number of points slower based upon the Flynn effect, the true IQ score has to do with populations." Dr. Frumkin said that he disagrees with psychologists who "subtract that Flynn effect number from the IQ score and say this is the person's IQ." He "do[es not] believe one should do that because [the Flynn effect] has to do with population[s] and not . . . a specific individual." Dr.

Frumkin noted that "[b]oth the score of 80 [in 1992] is what it was and the score of 74 in 2010 is what it was, except that score of 80, I didn't talk about Flynn."

Dr. Brannon agreed that the Flynn effect is something to consider when using older, standardized tests, but he also testified that there is no way of applying the Flynn effect "in any sort of reasonable scientific way" to Haliburton or any individual. He explained that it is especially important to be cautious with the Flynn effect in regards to individuals at the lower end of the IQ spectrum, because "the brightest people or average to above average people" at the high end of the spectrum—who, Dr. Brannon said, would intuitively be expected to be more intellectually curious—may be affected the most by the Flynn effect. Dr. Brannon further opined that "applying group norms [like the Flynn effect] to individuals is trickery[,] especially when you don't know where they fall in the distribution." Moreover, this Court previously observed that there is no requirement that the Flynn effect be applied to IQ scores in intellectual disability cases. *Quince v. State*, 241 So. 3d 58, 61 (Fla. 2018). We therefore find no error in the trial court's

decision to decline to apply the Flynn effect to adjust Haliburton's scores of 80 downward.

## 2. Deficits in Adaptive Behavior

Section 921.137(1) defines "adaptive behavior" as "the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." This Court has further elaborated on this prong, as explained in the DSM-5[8] and the AAIDD-11[9]:

> The AAIDD-11 and DSM-5 definitions are mostly similar to the statutory definition. *Compare* § 921.137(1), *with* DSM-5, at 37, *and* AAIDD-11, at 6, 43. Comparable to IQ scores, the AAIDD-11 recommends that adaptive deficits be established by standardized tests when an individual scores approximately two standard deviations below the population mean, with the results accounting for SEM. AAIDD-11, at 47; *see also* DSM-5, at 37.
> The DSM-5 divides adaptive functioning into three broad categories or "domains": conceptual, social, and practical. DSM-5, at 37; *see also* AAIDD-11, at 43. The conceptual domain "involves competence in memory, language, reading, writing, math reasoning, acquisition of

8. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).

9. American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010).

practical knowledge, problem solving, and judgment in novel situations." DSM-5, at 37. The social domain "involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment." *Id.* The practical domain "involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization." *Id.* According to the DSM-5, adaptive deficits exist when at least one domain "is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." *Id.* at 38; *see* AAIDD-11, at 43.

*Wright v. State*, 256 So. 3d 766, 773 (Fla. 2018).

Dr. Frumkin testified,

[Y]ou know there are three main areas; conceptual, social and practical, but there's a number of different subcategories in these different areas. And if you're showing that someone has to have two or more deficits in adaptive functioning, it's two of more of any of these dozens of various different areas that you're looking at.

But while Dr. Frumkin considers a domain "sufficiently impaired that ongoing support is needed" if there is a deficit in one of the subcategories within a domain, both the DSM-5 and AAIDD-11 require not just a deficit in a subcategory of a domain, but that an entire domain be "sufficiently impaired that ongoing support is

- 19 -

needed in order for the person to perform adequately in" that domain.

Dr. Frumkin administered the Wide Range Achievement Test-4 (WRAT-4) to Haliburton, which measures functional academics, on which Haliburton achieved a word reading standard score of 78 (seventh percentile), a sentence comprehension standard score of 83 (thirteenth percentile) a reading composite standard score of 78 (seventh percentile), a spelling standard score of 84 (fourteenth percentile), and a math computation score of 73 (fourth percentile). Because Haliburton's math computation score was low on the WRAT-4, Dr. Frumkin concluded that "he has a deficit there." Essentially, Dr. Frumkin considered Haliburton's low functional academic score in math computation to be sufficient to establish that Haliburton's conceptual domain "is sufficiently impaired that ongoing support is needed in order for [Haliburton] to perform adequately in one or more life settings."

Dr. Frumkin also administered the ABAS-II to three of Haliburton's siblings but ultimately concluded that the numerical results were invalid. Dr. Frumkin found that his interviews of Haliburton's siblings "produced the best information" regarding

Haliburton's adaptive functioning. He noted that Haliburton's sister said that Haliburton had major problems in reading and could not comprehend what he did read; he could not do laundry as a child, and as he got older, he still could not really cook, clean, or wash clothes; and as a teenager, he tried to help younger children with their homework, but he did not know how to do the work himself. John R. said that Haliburton "wasn't smart" in math, reading, and science; he did not believe Haliburton knew how to cook; and that Haliburton's "memory is not too good." And John H. said that Haliburton lacked common sense; only knew how to solve problems by fighting; was unable to follow directions involving more than three city blocks; would leave out the middle of a story; and was unable to communicate instructions to people. Dr. Frumkin also interviewed Haliburton's former employer, Charles Johnson, who described Haliburton as a "worker bee" who did as he was told and did not have the mental capacity to organize or plan ahead.

Besides Haliburton's deficit in math, which falls in the conceptual domain, Dr. Frumkin did not reveal on direct examination in which other domain Haliburton was sufficiently impaired. When pressed on cross-examination regarding in which

other domain he found sufficient impairment, Dr. Frumkin was still vague. A conjunctive review of Dr. Frumkin's report and testimony suggests that the two domains in which he found deficits sufficient to conclude that Haliburton met the adaptive functioning prong were the conceptual and social. But because Dr. Frumkin testified that the social domain was Haliburton's strongest domain, it is not entirely clear that Dr. Frumkin found any deficit in the social domain sufficient to meet the criteria for this prong. Dr. Frumkin did write in his report, "While his relative strength is in the area of social and interpersonal skills, he still seems deficient in that as well," but Dr. Frumkin's opinion that Haliburton "seems deficient" is equivocal and does not imply that the deficit was such that it rendered the entire social domain sufficiently impaired that ongoing support is needed. And Dr. Frumkin did not testify that Haliburton had deficits in all three domains but made only the conclusory statement he had "little doubt that Mr. Haliburton has, and had, concurrent deficits in adaptive functioning in at least two areas."

Dr. Brannon disagreed with Dr. Frumkin's conclusion that Haliburton met the adaptive deficits prong. Dr. Brannon reviewed Haliburton's school records and noted that in the last three years of

- 22 -

his formal education his grades ranged from above average to failing and it was reported that Haliburton did not complete his education due to behavioral problems. Dr. Brannon reviewed prison records from a previous incarceration which noted that Haliburton was a full-time student, enrolled in both an academic program, in which he was described as having "average ability," and a vocational auto body repair program. Haliburton was also enrolled in a CETA auto body program before he went to prison. Dr. Brannon noted that Haliburton made multiple clear and grammatically correct written requests over a period of time to prison authorities about the living conditions and his medical and dental needs.

In concluding that Haliburton's deficits do not rise to the level required to satisfy the second prong of the intellectual disability standard, Dr. Brannon wrote that Haliburton's "ability to engage in Activities of Daily Living (ADLs) appeared intact at the time of his arrest and during the course of the current assessment." But according to the DSM-5, the severity of the deficits required for an intellectual disability diagnosis "limit functioning in one or more activities of daily life." DSM-5, at 33.

The trial court agreed with Dr. Brannon, writing,

Ultimately, having considered the evidence and record in this case, the Court agrees with Dr. Brannon's assessment. On balance, while the Court finds Defendant does suffer significant deficits in mathematical reasoning skills, the Court does not find Defendant's remaining deficits—of which there appear to be several— to be of such magnitude as to say that one or more of the adaptive function domains "is sufficiently impaired that ongoing support is needed." *Wright*, 256 So. 3d at 773 (citing DSM-V, at 38.). Stated differently, the Court finds Defendant has failed to demonstrate by clear and convincing evidence that he satisfies the second prong of the intellectual disability analysis.

The trial court's conclusion that Haliburton "has failed to demonstrate by clear and convincing evidence that he satisfies the second prong of the intellectual disability analysis" is supported by competent, substantial evidence. This Court has defined clear and convincing evidence as an "intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy." *In re Davey*, 645 So. 2d 398, 404 (Fla. 1994). Here, Dr. Frumkin's testimony and written evaluation both lack clarity as to the domains in which he found Haliburton to have impairment sufficient to satisfy the second prong of the intellectual disability standard. Dr. Frumkin

never explained why he found these domains "sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings" or in which "life setting" ongoing support was needed. Having "little doubt" that Haliburton has concurrent deficits in adaptive functioning in at least two areas and "seem[ing] deficient" in a domain do not rise to the level of clear and convincing evidence.

As to the math deficit, Dr. Frumkin did not explain why being in the fourth percentile in functional academic math would require "ongoing support." Moreover, Dr Frumkin was unable to establish these adaptive deficits "by standardized tests when an individual scores approximately two standard deviations below the population mean," as suggested by the AAIDD-11 and DSM-5. Although Dr. Frumkin administered the WRAT-4 to Haliburton, he did not indicate that any of Haliburton's scores—including his math computation score—fell approximately two standard deviations below the population mean.

In his initial brief to this Court, Haliburton also asserts that in concluding that he did not meet the adaptive deficits prong, the trial court did what *Moore v. Texas,* 137 S. Ct. 1039, 1050 (2017),

"expressly forbids it to: it scoured the record for putative strengths to offset or explain the deficits it did find." We disagree.

*Moore*—as do the DSM-5 and the AAIDD-11—cautioned against overemphasizing perceived adaptive strengths when evaluating the adaptive deficits prong. 137 S. Ct. at 1050. But we have long recognized that

> the trial court does not weigh a defendant's strengths against his limitations in determining whether a deficit in adaptive behavior exists. Rather, after it considers "the findings of experts and *all other evidence*," Fla. R. Crim. P. 3.203(e), it determines whether a defendant has a deficit in adaptive behavior by examining evidence of a defendant's limitations, as well as evidence that may rebut those limitations.

*Dufour v. State*, 69 So. 3d 235, 250 (Fla. 2011). Rather than "overemphasizing perceived adaptive strengths" or "scour[ing] the record for putative strengths to offset or explain the deficits it did find," the trial court here, in its detailed analysis of this prong, properly considered the findings of both experts as well as all of the other evidence, including the evidence that rebutted many of the limitations posited by Dr. Frumkin, before concluding that Haliburton failed to meet this prong.

- 26 -

### 3. Age of Onset

As to the third prong of the intellectual disability standard, the trial court noted that "[w]hile Dr. Frumkin and Dr. Brannon disagreed as to the level of Defendant's deficits, they did both agree that those deficits manifested prior to Defendant's eighteenth birthday." The parties appear to incorrectly interpret this statement as a finding that Haliburton established that he met this third prong, but that is not what the trial court said. The trial court was simply saying that Haliburton's deficits—which it had already determined were insufficient to establish intellectual disability— were also present when he was a minor.

Where significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior is not established, there is no relevant condition that could have manifested prior to age eighteen to establish the third prong. Manifestation prior to age eighteen of subaverage intellectual functioning or adaptive deficits that do not rise to the levels required to meet the first two prongs of the intellectual disability standard is irrelevant to a determination of intellectual disability.

Because competent, substantial evidence supports the trial court's findings that Haliburton failed to establish that he has significantly subaverage intellectual functioning or concurrent deficits in adaptive behavior sufficient to meet the second prong of the intellectual disability standard, Haliburton necessarily cannot meet the third prong. Thus, the trial court did not err in failing to find that Haliburton meets the third prong.

### 4. Holistic Review

Haliburton argues that the trial court failed to conduct a "holistic review" that considers all three prongs of the intellectual disability standard together in an interdependent fashion. Haliburton relies on *Hall* and language in *Oats v. State*, 181 So. 3d 457, 467-68 (Fla. 2015) (citing *Hall*, 572 U.S. at 723), stating that "if one of the prongs is relatively less strong, a finding of intellectual disability may still be warranted based on the strength of other prongs." Without endorsing the quoted portion of *Oats*, we note that language has no application in this case. Here, we do not have "one" prong that is "relatively less strong"; we have three prongs that were not established.

Further,

*Hall* recognizes that the existence of an IQ score evidencing significantly subaverage general intellectual functioning is a threshold requirement for determining whether an individual is intellectually disabled: "For professionals to diagnose—and for the law then to determine—whether an intellectual disability exists *once the SEM applies and the individual's IQ score is 75 or below* the inquiry would consider factors indicating whether the person had deficits in adaptive functioning." *Hall*, [572 U.S. at 714] (emphasis added).

*Walls v. State*, 213 So. 3d 340, 350 (Fla. 2016) (Canady, J., dissenting), *overruled by Phillips v. State*, 299 So. 3d 1013 (Fla. 2020). Thus, even in cases where a trial court considers evidence of multiple prongs of the intellectual disability test, the "threshold, independent requirement [that significantly subaverage general intellectual functioning be established in accordance with section 921.137(1) once the SEM is taken into account] should not be cast aside in the name of 'holistic review.' " *Id.* (Canady, J., dissenting).

Moreover, the trial court did conduct a "holistic review." It did not reach its conclusion that Haliburton failed to establish that he is intellectually disabled based solely on his failure to meet the first prong of the intellectual disability standard but instead proceeded to conduct a detailed analysis of the testimony concerning the adaptive deficits prong and the "conjunctive and interrelated

- 29 -

assessment" of all three prongs of the standard as completed by *Hall*, 572 U.S. at 723, and *Oats*. Thus, we conclude that the trial court did not err in failing to conduct a "holistic review."

## B. Section 921.137(4), Florida Statutes

Haliburton also argues that he is entitled to relief because section 921.137(4), Florida Statutes (2019), which requires that defendants establish their intellectual disability by clear and convincing evidence, is unconstitutional under *Atkins* and the Eighth and Fourteenth Amendments to the United States Constitution, and that his claim of intellectual disability should have been analyzed under the more lenient preponderance of the evidence standard instead. But the trial court discredited Haliburton's own expert, without whose testimony the preponderance of the evidence standard clearly could not be met. Thus, because we conclude that Haliburton's claim would have failed even under the preponderance of the evidence standard, we need not address the constitutionality of the clear and convincing evidence standard in section 921.137(4). *See Singletary v. State*, 322 So. 2d 551, 552 (Fla. 1975) ("[C]ourts should not pass upon the

- 30 -

constitutionality of statutes if the case in which the question arises may be effectively disposed of on other grounds.").

### C. Nonunanimous Death Recommendation

During the pendency of the intellectual disability litigation below, Haliburton filed a successive 3.851 motion in light of *Hurst*, 577 U.S. 92, *Hurst v. State*, 202 So. 3d 40, *Asay v. State*, 210 So. 3d 1 (Fla. 2016), and *Mosley v. State*, 209 So. 3d 1248 (Fla. 2016), contending that his death sentence imposed following a nonunanimous jury recommendation of death violated the Fifth, Sixth, Eighth, and Fourteenth Amendments. Haliburton concedes that we have in other cases repeatedly rejected the same arguments he has made but wishes to preserve them for federal review, pursuant to our instruction in *Sireci v. State*, 773 So. 2d 34, 41 n.14 (Fla. 2000). We therefore affirm the denial of the successive motion containing these claims without further discussion.

### III. CONCLUSION

For these reasons, we affirm the trial court's order denying Haliburton's motion for a determination of intellectual disability as

a bar to execution and his amended successive motion for

postconviction relief.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Palm Beach County,
    Jeffrey Colbath, Judge – 501982CF001893AXXXMB

Neal Dupree, Capital Collateral Regional Counsel, Brittney N. Lacy, Assistant Capital Collateral Regional Counsel, and Todd G. Scher, Special Assistant Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Rhonda Giger, Assistant Attorney General, West Palm Beach, Florida,

    for Appellee